IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JL, through her next friend, Bruce Thompson, Esq.
EH, through her next friend, Feliz Rael, Esq.
RH, through her next friend, Barbara Creel, Esq.
Teresa Gomez, as sister and next friend of and on behalf of DA, and
KC, through her next friend Dianne Garrity, Esq.,

       Plaintiffs,

                                     Civil No. 12-1145 MV/LAM

   v.

NEW MEXICO DEPARTMENT OF HEALTH,
LOS LUNAS CENTER FOR PERSONS WITH
DEVELOPMENTAL DISABILITIES,
CATHERINE TORRES, in her official capacity as
Secretary of the New Mexico Department of Health,
BETH SCHAEFER, individually and in her capacity
as agent for the New Mexico Department of Health,
DAN SANDOVAL, individually and in his capacity
As agent for the New Mexico Department of Health,
ROGER ADAMS, individually and in his capacity
As agent for the New Mexico Department of Health,
JOSEPH MATEJU, individually and in his capacity
As agent for the New Mexico Department of Health,
EASTERN NEW MEXICO MENTAL RETARDATION
SERVICES d/b/a/ EASTERN NEW MEXICO
REHABILITATIVE SERVICES FOR THE HANDICAPPED, INC.,
DAMIAN HOUFEK, individually and in his capacity
as agent for ENMRSH, Inc.,
ROBERT SPENCER, individually and in his capacity
as agent for ENMRSH, Inc.,
THE ROBERT B. SPENCER FOUNDATION, and
ZIA HOLDING CORPORATION a/k/a Zia Housing Corporation,

       Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

THIS MATTER comes before the Court on Plaintiffs' Motion for Temporary Restraining

Order and Preliminary Injunction and Memorandum in Support Thereof [Doc. 64].   The Court,

having considered the Motion, briefs, relevant law and being otherwise fully informed, finds that

the Motion is not well-taken and will be denied.

## BACKGROUND

The instant case was filed on behalf of five developmentally disabled Plaintiffs who are

clients of Defendant Eastern New Mexico Mental Retardation Services d/b/a Eastern New Mexico

Rehabilitative Services for the Handicapped, Inc. ("ENMRSH").   Doc. 1 -1 at ¶ 3.   ENMRSH

receives funding through the State's Developmental Disabilities ("DD") Waiver program to

provide residential, day habilitation and supported employment services to individuals with

developmental disabilities.   *Id.*   At various times, Defendants Damian Houfek and Robert B.

Spencer have each been the president and CEO of ENMRSH.   *Id.*   The Complaint alleges, *inter

alia*, that Plaintiffs have suffered abuse and neglect caused or permitted by ENMRSH, Houfek and

Spencer (collectively, the "ENMRSH Defendants"), have been exploited by the ENMRSH

Defendants, and have been deprived of the full array and quality of services, support and benefits

to which they are entitled by law from the ENMRSH Defendants.   *Id.* at ¶ 8.

The Complaint asserts nine substantive causes of action against the ENMRSH Defendants.

*Id.* at ¶¶ 373-458.   Those causes of action include federal claims of substantive and procedural

due process violations, violation of the Rehabilitative Act, and violation of the Americans with

Disabilities Act, in addition to state claims of violation of the New Mexico Unfair Practices Act,

breach of fiduciary duty, negligence, breach of contract, breach of the implied covenant of good

faith and fair dealing, fraud/constructive fraud, and interference with the marital relationship of

two of the Plaintiffs.   *Id.*   The Complaint seeks damages, equitable relief, and declaratory relief.

*Id.* at 98-100.

On April 3, 2013, Plaintiffs filed the instant motion, seeking both a temporary restraining order and a preliminary injunction.   Doc. 64 at 26-27.   In their request for a temporary restraining order, Plaintiffs ask the Court to require that the ENMRSH Defendants take the following specific actions: (1) follow the orders issued by JL's physicians and other health care professionals, and carry out all medical orders and instructions for JL; (2) provide direct care staffing at night and on weekends for JL; (3) monitor and assist JL to manage her prescribed narcotic medications; (4) ensure that JL is provided with a properly fitting wheelchair; (5) provide JL with a medical alert necklace or bracelet; (6) desist communications with Plaintiffs for the purposes of initiating changes in Plaintiffs' individual service plans, unless there is an inter-disciplinary meeting and notice and an invitation to attend provided to Plaintiffs' attorneys; (7) carry out all health care providers' and therapists' instructions for DA related to his need for ambulation and a walking program that includes allowing and encouraging DA to walk in and about his home; (8) perform all medical follow up related to DA's increased seizure activity and increased frequency of urinary tract infections; (9) monitor EH's food and fluid intake in compliance with her medical providers' instructions and orders; (10) protect EH from suffering further unplanned, undesirable weight loss, including providing food to EH that is palatable, appetizing, nutritious, and consistent with EH's physician-ordered diabetic diet requirements; (11) provide EH with the staff supervision required to keep her safe from additional injury from falls and establish and implement physical therapy services and plans to protect EH from additional falls and to prevent avoidable regression in her strength; (12) provide 1:1 staff who are familiar with Plaintiffs' health care history to accompany all Plaintiffs during all medical or health care appointments, including while waiting in urgent care or hospital emergency rooms and during transfers between medical facilities; (13) ensure that RH receives proper and prompt attention to all orthopedic and neurologic concerns with his hands and

3

wrists, including neurodiagnostic testing; (14) design and implement a crisis management plan to address RH's risk of self-harm; and (15) ensure that KC obtains and documents her blood-glucose levels on a daily basis, and assist KC to ensure that, at least weekly, her blood-glucose levels are reported to her primary care physician.   *Id.*   In their request for a preliminary injunction, Plaintiffs seek an order requiring the ENMRSH Defendants, more generally, to: (1) provide needed health care coordination and follow up on and oversee Plaintiffs' primary health care in compliance with Plaintiffs' individual service plans and the recommendations and orders of Plaintiffs' treating medical providers; (2) follow up on all annual dental care and oral care for Plaintiffs; (3) in coordination with Plaintiffs' primary care physicians, perform and document performance of all annual assessments, tests, and immunizations, and ensure delivery of results of all such assessments, tests, and immunizations to Plaintiffs' primary care physicians; (4) design and train staff on crisis management plans for all Plaintiffs; and (5) review and document the assessment of environmental hazards in Plaintiffs' homes.   *Id.* at 27.

Pursuant to the Court's request, on April 9, 2013, Plaintiffs filed their Supplemental Briefing Regarding Application for Temporary Restraining Order.   Doc. 71.   Pursuant to the expedited briefing schedule set by the Court, the ENMRSH Defendants filed a response in opposition to Plaintiffs' Motion on April 15, 2012, Doc. 75, and Defendants New Mexico Department of Health, Los Lunas Center for Persons with Developmental Disabilities, Catherine Torres, Beth Schaefer, Dan Sandoval, Roger Adams and Joseph Matheju (collectively, the "State Defendants") filed a response in opposition on April 14, 2013.   Doc. 74.   After seeking and receiving an extension of time to file reply briefs, on April 25, 2013, Plaintiffs filed a reply to the ENMRSH Defendants' response, Doc. 80, and a reply to the State Defendants' response.   Doc. 81.

4

## STANDARD

A preliminary injunction "is an extraordinary remedy," and accordingly, "the right to relief must be clear and unequivocal." *Schrier, M.D. v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (citation omitted).   To obtain a preliminary injunction, Rule 65 of the Federal Rules of Civil Procedure requires the moving party to establish that four equitable factors weigh in favor of the injunction:   "(1) irreparable injury in the absence of the injunction, (2) the threatened injury to the moving party outweighs the harm to the opposing party resulting from the injunction, (3) the injunction is not adverse to the public interest, and (4) the moving party has a substantial likelihood of success on the merits." *Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009).[1]

"[T]he limited purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Schrier*, 427 F.3d at 1258 (citation omitted).   For this reason, the Tenth Circuit has identified three types of specifically disfavored preliminary injunctions:   "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Id.* (citation omitted).   "[A]ny preliminary injunction fitting into one of the disfavored categories must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficente Uniao Do Vegetal*, 389 F.3d 973, 975 (10th Cir. 2004), *aff'd*, 546 U.S. 418 (2006).   Further, "a party seeking such an

---

1   The requirements for issuance of a temporary restraining order are similar to those for issuance of a preliminary injunction. *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 633 F. Supp. 2d 1257, 1267 (D.N.M. 2008).   Unlike a preliminary injunction, if certain circumstances exist, a temporary restraining order may issue without notice to the opposing party, and is of limited duration. *Id.*

injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms."   *Id.* at 976.

With regard to the first type of disfavored preliminary injunctions, those that alter the status quo, the Tenth Circuit has explained that the "status quo is the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing."   *Schrier*, 427 F.3d at 1260.   "In determining the status quo for preliminary injunctions, this court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights."   *Id.*   With regard to the second type of disfavored preliminary injunctions, those that are mandatory, the Tenth Circuit has explained that an injunction is mandatory "if the requested relief affirmatively requires the nonmovant to act in a particular way, and as a result places the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction."   *Id.* at 1261.

## DISCUSSION

I.   Plaintiffs Request Injunctive Relief That Falls Into Two of the Disfavored Categories.

Plaintiffs maintain that the injunctive relief they seek is not disfavored, as it would preserve rather than disturb the status quo, is prohibitory as opposed to mandatory, and would afford them less than all of the relief they could recover after a trial on the merits.   While the Court agrees with the undisputed proposition that, if successful at trial, Plaintiffs could recover more than they seek to recover on this motion, the Court cannot agree that Plaintiffs simply seek to maintain the status quo and to impose prohibitions on the ENMRSH Defendants.

Plaintiffs characterize their requests for relief as seeking to "maintain and foster . . . the status quo relationship of a caregiver providing all required services to care recipient."   Doc. 64 at 18.   Nowhere in their submissions, however, do Plaintiffs suggest that the ENMRSH Defendants

6

were ever providing "all required services" to Plaintiffs.   Further, rather than seek an order that

requires the ENMRSH Defendants to resume the provision of services they had ceased providing,

Plaintiffs ask the Court to order the ENMRSH Defendants to undertake twenty specific, itemized

actions, none of which Plaintiffs contend the ENMRSH Defendants had previously undertaken.

Accordingly, there is no basis to conclude that, by requiring the ENMRSH Defendants to

undertake the enumerated actions, the Court would be returning the parties to the "status quo."

Indeed, Plaintiffs have identified no status quo to which the parties can be returned.

This case thus is distinguishable from *Schrier*, where the plaintiff moved for a preliminary

injunction ordering the University of Colorado to reinstate him as Chair of the Department of

Medicine, a position he had held for more than 26 years.   427 F.3d at 1257.   The Tenth Circuit

explained that the "last peaceable uncontested status existing between the parties before the

dispute developed was when Dr. Schrier was still serving as Chair."   *Id.* at 1260.   Accordingly,

the Tenth Circuit held that the plaintiff's request for reinstatement sought "to preserve rather than

disturb the status quo, regardless of whether or not he [was] legally entitled to such reinstatement."

*Id.*

In contrast, here, Plaintiffs have neither alleged nor established that the "last uncontested

status existing between the parties before the dispute developed" involved the provision of the

services that Plaintiffs now ask this Court to require the ENMRSH Defendants to provide.

Plaintiffs' request that the Court order the ENMRSH Defendants "to provide an adequate level of

care," Doc. 64 at 18, is essentially a request that this Court decide the level of care to which

Plaintiffs are legally entitled, and order the provision of such a level of care.   As Plaintiffs

acknowledge in their motion, however, the status quo is defined not by the parties' legal rights, but

rather by the reality of the pre-existing status and relationship between the parties.   In the absence

of evidence (or even allegations) that the reality of the pre-existing status and relationship of the parties involved the provision of the services enumerated in Plaintiffs' requests for relief, granting those requests would alter the status quo.

Additionally, the relief requested by Plaintiffs would affirmatively require the ENMRSH Defendants "to act in a particular way," that is, take the fifteen specific steps set forth in their request for a temporary restraining order, in addition to the five steps set forth in their request for a preliminary injunction.   Indeed, the preliminary injunction alone would require the ENMRSH Defendants to act specifically to provide health care coordination, follow up on dental and oral care, perform and document performance of assessments, tests, and immunizations, design crisis management plans and train staff on those plans, and review and document the assessment of environmental hazards.   Further, by ordering the ENMRSH Defendants to take these affirmative actions, the Court would be placed in a position where it might have to provide ongoing supervision to assure that the ENMRSH Defendants are abiding by the injunction.   If, for example, the ENMRSH Defendants did not provide what, in Plaintiffs' estimation, constitutes "needed" health care coordination, or did not provide what Plaintiffs believe to be "proper and prompt attention" to RH's orthopedic and neurologic concerns, this Court undoubtedly would be called upon to monitor the ENMRSH Defendants' compliance with the injunction.   For these reasons, the injunctive relief sought by Plaintiffs is mandatory in nature.

II.      Plaintiffs Fail to Make the Required Showing to Entitle Them to the Relief They Seek.

Because the injunction Plaintiffs seek would alter the status quo and is mandatory in nature, their request for relief is disfavored.   As a result, the Court must closely scrutinize Plaintiffs' request, to assure that the exigencies of this case support the granting of an extraordinary remedy.   In order to prevail on their motion, Plaintiffs must make a strong showing

both with regard to the likelihood of success on the merits and with regard to the balance of harms. The Court finds that Plaintiffs have not made a showing, much less a strong showing, of the equitable factors necessary to establish entitlement to the injunctive relief they seek.

A.      Likelihood of Success on the Merits

In support of their argument that they are likely to succeed on the merits of their claims, Plaintiffs state only that the "ENMRSH Defendants are, at the very least, in violation of several of the New Mexico Developmental Disabilities Service Standards."   Doc. 64 at 24.   The Developmental Disabilities (DD) Waiver Service Standards (the "Standards") were established by the Developmental Disabilities Support Division of the New Mexico Department of Health ("DOH") "to guide service delivery and promote the health and safety of individuals served by DD Medicaid Waiver Provider Agencies."   Standards (Apr. 1, 2007) at 1.   The Standards indicate that "All Provider Agencies that enter into a contractual relationship with DOH to provide Developmental Disabilities Waiver Services shall comply with all applicable standards herein set forth."   *Id.*

In particular, Plaintiffs cite to the "Definitions" section of the Standards, which defines the term "Health Care Coordinator" as "the designated individual on the interdisciplinary team who monitors and arranges for health care services for an individual in accordance with these standards."   *Id.* at v.   Additionally, Plaintiffs cite to provisions applicable to Community Living Services, which "establish requirements for DD Medicaid Waiver agencies providing services through Community Living Services Programs."   *Id.* at 89.   Specifically, Plaintiffs note that the scope of Community Living Services includes, as identified by the interdisciplinary team ("IDT") members:

> Implementation of the ISP [individualized service plan] Therapy, Meal-time,
> Positive Behavioral Supports, Health Care, and Crisis Prevention/Intervention
> Plans, if applicable; . . . Assistance in developing health maintenance supports, as
> well as monitoring the effectiveness of such supports; . . . and Assist the individual
> as needed, in coordination with the designated healthcare coordinator and others on
> the IDT, with access to medical, dental, therapy, nutritional, behavioral and nursing
> practitioners and in the timely implementation of healthcare orders, monitoring and
> recording of therapeutic plans or activities as prescribed, to include: health care and
> crisis prevention/intervention plans.

*Id.* at 90.   Further, for individuals receiving Community Living Services, the provider agency

must "ensure and document . . . "[p]rovision of health care oversight consistent with the Standards

as detailed [in an earlier provision]."   *Id.* at 94.   Finally, Plaintiffs note that the Standards require

that individuals working as direct support staff and supervisors for Community Living Service

Provider agencies demonstrate, *inter alia*, the "ability to assist the individual to meet his or her

physical (e.g., health, grooming, toileting, eating) and personal management needs, by teaching

skills, providing supports, and building on individual strengths and capabilities."   *Id.* at 99.

Plaintiffs, however, fail to explain how a violation of these provisions would be relevant to,

much less dispositive of, any of the causes of action they assert against the ENMRSH Defendants.

As an initial matter, seven of those causes of action do not appear to involve the coordination of

health care, or any other issue addressed in the cited provisions of the Standards.   *See* Doc. 1-1 at

¶¶ 394-424, 435-458 (setting forth causes of action against the ENMRSH Defendants for violation

of the Rehabilitation Act, violation of the Americans with Disabilities Act, violation of the New

Mexico Unfair Practices Act, breach of fiduciary duty, breach of contract, fraud, and interference

with marital relationship).

The Court recognizes that Plaintiffs' seventh cause of action, brought pursuant to 42

U.S.C. Section 1983, alleges that the ENMRSH Defendants violated Plaintiffs' substantive and

procedural due process rights under the Fourteenth Amendment by, *inter alia*, "[f]ailing to provide

Plaintiffs with minimally adequate medical care, and health care coordination, including dental, mental health, and vision care." *Id.* at 79. Plaintiffs, however, may not rely on alleged violations of such state administrative provisions to support their Section 1983 claim. *See Couture v. Board of Educ. of Albuquerque Pub. Schs.*, 535 F.3d 1243, 1255 (10th Cir. 2008) (quoting *Davis v. Scherer*, 468 U.S. 183, 194-96 (1984)). It is well-settled that claims based on violations of state law are not actionable under Section 1983. *See Fantini v. Salem St. College*, 557 F.3d 22, 33 (1st Cir. 2009) (dismissing Section 1983 claim where plaintiff identified no legal basis for claiming that a violation by defendants of state law violated her rights under the Fourteenth Amendment); *Erikson v. Pawnee County Board of County Comm'rs*, 263 F.3d 1151, 1153 n.2 (10th Cir. 2001) (dismissing plaintiff's federal due process claim on basis that violation of state law, without more, is not actionable under Section 1983), *cert. denied*, 535 U.S. 971 (2002); *Jones v. City & County of Denver, Colo.*, 854 F.2d 1206, 1209 (10th Cir. 1988) ("Section 1983 . . . does not provide a basis for redressing violations of *state* law, but only for those violations of *federal* law done under color of state law.") (emphasis in original). Because any violation of the Standards by the ENMRSH Defendants thus is inapposite to Plaintiffs' Fourteenth Amendment claims, evidence that the ENMRSH Defendants violated the Standards is equally inapposite to the issue of whether Plaintiffs are likely to succeed on the merits of their Fourteenth Amendment claims.

The only claim as to which the Standards arguably are relevant is Plaintiffs' claim of negligence, set forth in the twelfth cause of action. *See* Doc. 1-1 at ¶¶ 425-434. Specifically, Plaintiffs allege that the ENMRSH Defendants breached their duties to Plaintiffs by, *inter alia*, "failing to ensure that each Plaintiff had a health care coordinator who is capable of coordinating Plaintiffs' health care services." *Id.* at ¶ 430. Additionally, Plaintiffs allege that the ENMRSH Defendants have been negligent in the "[f]ailure to address Plaintiffs' chronic and acute medical

needs." *Id.* at 431.   The Complaint, however, does not allege that these failures constituted a violation of the Standards, or that Plaintiffs' claim of negligence relies at all on a violation of the Standards.   Indeed, there is no mention of the Standards in the Complaint.

Similarly, there is no mention of Plaintiffs' negligence claim in Plaintiffs' instant motion, let alone any legal analysis explaining how the ENMRSH Defendants' violation of the Standards would prove their negligence claim.   In the absence of such analysis, the Court is left to guess as to how and whether a violation of the Standards makes it likely that Plaintiffs will succeed on the merits of their negligence claim.   By merely quoting from the Standards and stating that the ENMRSH Defendants violated those standards, without analyzing how that violation constitutes negligence, Plaintiffs fall short of meeting their burden of making a strong showing that they are likely to succeed on the merits of their negligence claim.

In any event, it is not clear from Plaintiffs' motion that the ENMRSH Defendants did, in fact, violate the Standards.   Plaintiffs' motion relies on findings by Natalie J. Russo, RN, regarding deficiencies in Plaintiffs' health care and health care coordination.   Doc. 64 at 3. Nowhere in their motion, however, do Plaintiffs link the deficiencies identified by Nurse Russo to failures by the ENMRSH Defendants to abide by the Standards.   Plaintiffs assert that the Standards "explicitly provide that healthcare coordination is a service that must be provided by the waiver provider."   Doc. 64 at 25.   In support of this assertion, Plaintiffs cite to the "Definitions" section of the Standards, which defines the term "Health Care Coordinator."   But that definition does not state that the waiver provider is responsible for designating the Health Care Coordinator. To the contrary, the Standards make clear that the health care coordinator is to be designated by the "IDT," or interdisciplinary team.   Standards at 94.   Pursuant to regulations issued by the DOH, the IDT consists of the "individual," the person with a developmental disability receiving services;

a "case manager," who is an independently-funded professional responsible for service coordination to the individual, external to, and independent from the service provider agency; a "guardian," if one is appointed by the Court; a "helper" chosen by the individual to assist with communication; "key community service provider staff," who are providers of residential employment, day program and behavioral services; "direct service staff," the provider staff members directly responsible for the provision of specified services to the individual; the "service coordinator," the community provider staff member who supervises, implements and monitors the service plan within the community service provider agency; "ancillary service providers," the service provider agencies and staff providing non-residential and non-day services; the "designated healthcare coordinator," the team member designated to coordinate medical supports and services which the individual requires to manage any chronic health conditions and to access preventative healthcare services; and "others" invited by the individual, including family members, advocates, and representatives.   NMAC 7.26.5.7.   Further, as a DOH publication submitted by Plaintiffs indicates, the designated healthcare coordinator "is not usually the agency nurse or service coordinator."   Doc. 80-3.

Given the plain language of the Standards and the regulations, and the absence of evidence linking the ENMRSH Defendants to the alleged deficiencies outlined by Nurse Russo, the Court is at a loss to understand Plaintiffs' attribution to the ENMRSH Defendants of responsibility for failures of the IDT to designate a health care coordinator, and for failures of the designated health care coordinators assigned to Plaintiffs to carry out their responsibilities.[2]   Indeed, Nurse Russo's findings are based not only on deficiencies of Plaintiffs' health care coordinators, but also on deficiencies of Plaintiffs' case managers.   Doc. 65-2 at 5, 19-27.   Pursuant to the regulations,

---

[2] None of the parties has identified who is the designated the health care coordinator for each Plaintiff.

13

however, the case managers must be independently-funded professionals external to and independent from ENMRSH, as the service provider agency.   Again, Plaintiffs provide no basis for the Court to place responsibility on the ENMRSH Defendants for the failures of these independent case managers.   In short, Plaintiffs simply fail to analyze how their factual allegations, concerning though they are, establish a violation of the Standards.   In the absence of such an analysis, Plaintiffs have failed to show that, in the first instance, the ENMRSH Defendants violated the standards, and thus have failed to establish the only basis for their argument that they are likely to succeed on the merits of their claims.

      B.    <u>Balance of the Harms</u>

      Plaintiffs argue that while denying the relief they seek would result in irreparable harm to them, granting that relief would result in virtually no harm at all to the ENMRSH Defendants, as it would require them to do no more than "coordinate long overdue health care for Plaintiffs," and will save them money in the damages they ultimately owe to Plaintiffs.   Doc. 71 at 8.   This argument rests on the premise that the ENMRSH Defendants are in fact failing to meet their obligations to Plaintiffs, and that Plaintiffs' claims ultimately will be meritorious.   As set forth above, however, Plaintiffs have failed to link their allegations of harm to the ENMRSH Defendants' failure to comply with their obligations, and thus have failed to establish that their claims will be meritorious.   Compliance with the requested injunction thus might not be as innocuous as fulfilling pre-existing obligations and avoiding inevitable damages.

      Indeed, the ENMRSH Defendants contend that an order requiring them to take the detailed steps requested in Plaintiffs' motion would cause them harm.   Specifically, the ENMRSH Defendants argue that the practical effect of the injunction requested by Plaintiffs would be to put them in a position of having to implement the specific actions requested by Plaintiffs, regardless of

14

whether those actions are in line with Plaintiffs' individualized service plans ("ISP"), which were developed, pursuant to regulation, by their IDTs.   According to the ENMRSH Defendants, an order from this Court thus would cause "immediate and widespread confusion" as to how the ENMRSH Defendants are to approach Plaintiffs' needs.   Doc. 75 at 36.   In light of this argument, which the Court finds persuasive, Plaintiffs have not made the strong showing required as to the balance of the harms.

       C.    <u>Public Interest</u>

In support of their argument that the injunction would not be adverse to the public interest, Plaintiffs state only that "[i]t is always in the public interest to prevent the violation of a party's constitutional rights," and that the "prevention of ENMRSH Defendants' violation of Plaintiffs' federal and state statutory rights to the minimal level of care [] is similarly in the public interest." Doc. 64 at 24.   Nowhere in their motion, however, do Plaintiffs argue, much less establish, that the ENMRSH Defendants have violated any of Plaintiffs' constitutional rights, federal statutory rights, or state statutory rights, or that the relief they seek would redress any such violations.

On the other hand, the State, through regulation, has made clear the strong public interest in ensuring that, for each individual with developmental disabilities receiving services in the community, there exist "a single, unified individual service plan, or ISP . . . developed by a single interdisciplinary team, or IDT."   NMAC 7.26.5.1.   Indeed, the very purpose of the regulation is to "establish a framework for planning, designing, implementing and modifying the individual service plan for an individual with developmental disabilities living in the community."   NMAC 7.26.5.6(C).

The Court finds that it would be adverse to the public interest, expressed through this regulation, for the Court to usurp the position of the IDT and order that certain health care and

health care coordination choices be made and implemented.   Plaintiffs' request for injunctive

relief asks the Court to do just that.   Specifically, Plaintiffs ask the Court to order the ENMRSH

Defendants to take twenty specific actions with regard to Plaintiffs' health care and coordination,

with no consideration as to whether those actions are authorized or even deemed favorable by

Plaintiffs' IDTs.   Further, Plaintiffs seek to place the Court in a position where it will be obligated

to provide ongoing supervision to ensure that the actions it has ordered are adequately taken.   The

Court, however, should not be in the business of micromanaging the provision of health care and

health care coordination to individuals with disabilities, especially at the expense of the ISP/IDT

system mandated by the State.   It undoubtedly would be adverse to the public interest for the

Court to grant the injunction sought by Plaintiffs, and thereby undertake such a task.

      D.    <u>Irreparable Injury</u>

Plaintiffs argue that, based on Nurse Russo's findings, the danger of irreparable injury is

clear.   According to Plaintiffs, if the Court "does not intervene to assist them," they are "in danger

of substantial deterioration in their mental and physical health and their living conditions."   Doc.

64 at 21.   The Court agrees that Nurse Russo's findings raise serious concerns, and that,

theoretically, threats to the health of incompetent or vulnerable individuals could be sufficient to

establish irreparable injury.

Here, however, Plaintiffs have failed to establish how the injunctive relief they request

would prevent the specific harms they wish to avoid.   As explained above, Nurse Russo's

findings and recommendations involve the designation of a health care coordinator, the execution

of the health care coordinator's duties, and the execution of the case manager's duties.   Plaintiffs

have not explained how the ENMRSH Defendants are responsible for the designation of a health

care coordinator, or for the execution of the duties of the health care coordinator or the case

manager, both of whom appear to be independent from ENMRSH.   Accordingly, the Court is hard-pressed to understand how ordering the ENMRSH Defendants to take specific actions would address the concerns raised by Nurse Russo.

Nor do Plaintiffs link each requested item of relief with a particular harm, and explain how the requested relief would address the threatened harm.   Further, Plaintiffs fail to provide the Court with any information regarding the ISPs in place for each Plaintiff.   Without any explanation as to how the specific actions they seek to require of the ENMRSH Defendants are required under those ISPs or, in the alternative, are necessary despite their contravention of those ISPs, the Court simply cannot conclude that ordering the injunctive relief sought by Plaintiffs would be proper.

## CONCLUSION

Plaintiffs seek an injunction that would alter the status quo and is mandatory in nature. Plaintiffs have failed to make a strong showing either that they are likely to succeed on the merits of their claims, or that the balance of the harms weighs in their favor.   Plaintiffs also have failed to establish that the failure to grant the relief they seek would be adverse to the public interest or would cause them irreparable injury.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum in Support Thereof [Doc. 64] is denied.

DATED this 22nd day of May, 2013.

_____
MARTHA VÁZQUEZ
United States District Judge

17