# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW MEXICO

JL, through her next friend, Bruce Thompson,
Esq., et al.

       Plaintiffs,

v.                                       No. 12-CV-1145 MV/LAM

NEW MEXICO DEPARTMENT OF HEALTH,
et al.,

       Defendants.


## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Individual DOH Defendants'[1] Motion and Memorandum in Support to Dismiss Plaintiffs' Procedural Due Process Claims on the Basis of Qualified Immunity ("Motion to Dismiss Procedural Due Process Claims"), [Doc. 267], the Individual DOH Defendants' Motion and Memorandum to Dismiss Plaintiffs' Court Access Claims Under the First and Fourteenth Amendments on the Basis of Qualified Immunity ("Motion to Dismiss Court Access Claims"), [Doc. 275], the Individual DOH Defendants' Motion to Dismiss Plaintiffs' First Amendment Claim on the Basis of Qualified Immunity and Supporting Memorandum ("Motion to Dismiss First Amendment Claim"), [Doc. 213], and the Individual DOH Defendants' Motion to Dismiss Plaintiffs' Fourth Amendment Claim on the Basis of Qualified Immunity and Supporting Memorandum ("Motion to Dismiss Fourth Amendment Claim"), [Doc. 212].   The Court, having considered the motions, briefs, and relevant law, and being otherwise fully informed, finds that the Motion to Dismiss Procedural Due Process Claims is

---

[1]   The "Individual DOH Defendants" refers to Defendants Beth Schaefer, Dan Sandoval, Roger Adams, and Joseph Mateju (referred to herein as "Defendants").

granted in part and denied in part, the Motion to Dismiss Court Access Claims is granted, the Motion to Dismiss First Amendment Claim is granted, and the Motion to Dismiss Fourth Amendment Claim is denied.

## BACKGROUND

In their First Amended Complaint ("complaint"), [Doc. 102], Plaintiffs JL, EH, RH, DA, KC, and GS assert claims against Defendants pursuant to 42 U.S.C. Section 1983 for violation of Plaintiffs' Fourteenth Amendment rights to procedural due process, First and Fourteenth Amendment rights to freedom of intimate association, First and Fourteenth Amendment rights to access of courts, and Fourth Amendment right to be free from unreasonable seizure.   Plaintiffs' claims arise out of Defendants' alleged unilateral decisions temporarily to transfer Plaintiffs JL, EH, RH, DA, and KC from State of New Mexico institutions housing people with developmental disabilities to various privately-run third-party settings, permanently to discharge Plaintiffs from the Los Lunas Hospital and Training School and the Fort Stanton Hospital and Training School (collectively, the "Training School"), and post-discharge to transport Plaintiffs JL, EH, DA, KC, and GS across the state for placement in private, third-party settings.   Defendants effectuated the transfers and placements without notice to Plaintiffs, without obtaining informed consent, and either without judicial process or without notice and an opportunity to be heard in that process. Defendants discharged Plaintiffs from the Training School without informing them of their discharges or that Defendants purported to sever the states' custodial relationship with Plaintiffs. Plaintiffs allege the following facts in support of their claims.

I.      Plaintiffs.

Plaintiffs are former residents of the Training School.   [Doc. 102 ¶ 1].   At the time of the events giving rise to Plaintiffs' claims, the New Mexico Department of Health operated the Training School.   [*Id.* ¶ 18].

Plaintiffs are developmentally disabled adults who are and were at the time of their placements at the Training School incapacitated due to their developmental disabilities.   [*Id.* ¶ 367].   Because of their disabilities, Plaintiffs were unaware of their constitutional rights.   [*Id.*].   Plaintiffs JL, EH, RH, DA, and KC were admitted by court order to the Training School between 1966 and 1973 pursuant to the 1953 New Mexico Developmental Disabilities Code's provisions for involuntary commitment.   [*Id.* ¶¶ 1, 12-17].   Plaintiff GS was admitted to the Training School in 1973 pursuant to the 1953 code's provisions for voluntary commitment.   [*Id.* ¶¶ 1, 17].

II.     Defendants and ENMRSH.

Defendants were employees of the DOH during the relevant timeframe.   [*Id.* ¶¶ 25, 27, 29, 31].   Beth Schaefer was an attorney for the Training School when Plaintiffs JL, EH, RH, KC, and GS were discharged.   [*Id.* ¶ 25].   "Schaefer directed Training School administrators to discharge residents from aftercare and State custody without due process," without follow-up, and without appointing surrogate decision makers.   [*Id.*].   Dan Sandoval was an employee of the Training School, and Director of Resident Living between 1979 and 1985 and had responsibility for Plaintiffs when they were discharged.   [*Id.* ¶ 27].   Roger Adams was the Deputy Administrator or Acting Administrator of the Training School, and made the placement and discharge decisions relating to Plaintiffs.   [*Id.* ¶ 29].   Joseph Mateju was the Administrator of the Training School, and made the final placement and discharge decisions relating to Plaintiffs.   [*Id.* ¶ 31].   Sandoval, Adams, and Mateju were members of the Screening Committee on Admissions and Releases

("SCAR") at the Training School, and Adams and Mateju personally attended most SCAR meetings and personally approved the discharge of Plaintiffs from aftercare.   [*Id.* ¶¶ 27, 29, 31]. Sandoval, Adams, and Mateju had responsibility for ensuring Plaintiffs' health, safety, and well-being, for supervising and monitoring Plaintiffs after they were placed outside the Training School, and for determining the suitability of the placements.   [*Id.*].

ENMRSH is a non-profit corporation that owned, operated, and managed facilities providing residential, community care, and supported employment services to individuals with developmental disabilities in eastern New Mexico.   [*Id*. ¶¶ 3, 7, 36].   ENMRSH receives government funding to provide these services.   [*Id.* ¶ 3].   "ENMRSH, although a private entity, is under state contract to provide services to individuals with disabilities, and ENMRSH acts under color of state law.   [*Id.* ¶ 436].

III.   The Aftercare Program.

Beginning in the 1970's, Training School administrators began to "farm out" residents from the Training School through the aftercare program.   [*Id.* ¶ 54].   Training School policies required periodic visits by Training School personnel and ongoing oversight of aftercare residents, [*id.* ¶ 59], and required a responsible adult to give consent for placement, [*id.* ¶ 60].   "Training School social workers were supposed to interview the prospective placement, oversee the placements, visit the people in aftercare and ensure their well-being."   [*Id.* ¶ 62].

The aftercare program was not operated in a manner consistent with its own policies.   [*Id.* ¶ 59].   Defendants "did not use any system to ensure that residents in aftercare would be safe, or that they would receive minimally adequate services."   [*Id.*].   Moreover, "placements were routinely implemented without consent by a responsible adult," [*id.* ¶ 60], and social workers failed to make required visits and ensure their well-being, [*id.* ¶ 63].   Regarding this latter failure,

Defendants "were aware that the social workers assigned . . . did not even visit residents in their community placements," and that when they did, the social workers relied on second-hand information relayed through telephone calls instead of required first-person contact.   [*Id.*].   Defendants "had direct authority to approve . . . this departure from policy and affirmatively acquiesced in the social workers' failure to follow policy."   [*Id.*].   The Training School did not have "any guidelines on how residents in aftercare placements would be cared for," did not have a "system to follow up with these residents," and did not have "a system to allow the Training School to know what the condition of the residents was[] and what services they needed."   [*Id.* ¶ 65].   Defendants "were well aware of the dangers residents faced due to the way the aftercare program was operated, but they proceeded anyway."   [*Id.* ¶ 68].

The complaint alleges that Defendants placed all Plaintiffs, with the exception of GS, on aftercare.   [*Id.* ¶¶ 12-15, 133-34, 192, 203, 298-99].   After placing Plaintiffs on aftercare, Defendants did not provide Plaintiffs with any periodic judicial review to determine whether their placements were appropriate and their needs were being addressed.   [*Id.* ¶ 92].   Instead, Defendants "abandoned Plaintiffs" without ensuring their needs were met and without providing protections against abuse, neglect, or exploitation.   [*Id.* ¶ 6].   Moreover, Defendants conducted Plaintiffs' aftercare placements without obtaining informed consent and without the appointment of guardians or substitute decision makers.   [*Id.*].   Defendants did not give Plaintiffs a choice regarding their aftercare placements.   [*Id.* ¶ 2].   In addition, Defendants placed Plaintiffs in these third-party settings without permission from the courts that had involuntarily committed them. [*Id.* ¶ 6].

IV.     <u>Discharge from the Training School and Post-Discharge Placement at ENMRSH</u>.

"The well-known failure by social workers to provide oversight for residents on aftercare led . . . Defendants . . . to decide to discharge residents from aftercare."   [*Id.* ¶ 69].   "Schaefer was in charge of changes in discharge procedures," [*id.* ¶ 71], and "advised administrators that the state institutions' custody of people committed to the institution by court order automatically lapsed on the [July 1, 1977,] effective date of the New Mexico Mental Health Code . . . despite extant judicial orders of commitment for an indeterminate period," [*id.* ¶ 72].[2]   "Schaefer concluded and directed administrators that a change in the Code meant that the court orders committing residents on aftercare to State custody had become void, regardless whether their original placement off the physical grounds of the Training School had been planned or judicially reviewed, or was even legal."   [*Id.*].   "[Schaefer] did not conduct legal research, but nonetheless opined and directed Training School administrators that the Training School no longer had *any* legal responsibility for any residents on aftercare as of the Code's effective date of July 1, 1977."   [*Id.*].   "Schaefer began directing that all residents of the Training School who were on aftercare should be discharged from the Training School without judicial review and without any due process protections."   [*Id.* ¶ 73].   "Schaefer instructed Training School administrators and staff that '[i]t's different now and you don't need a discharge order signed by a judge.'"   [*Id.* ¶ 77].   "Schaefer instructed [administrators] to 'just put a note in . . . the file that says he was discharged or she was discharged.'"   [*Id.*].   "Once there was a piece of paper in the file, residents could be, in Schaefer's words, 'cut loose' from the Training School."   [*Id.*].   "Schaefer considered the fall-out from the danger created for residents to be merely a 'public relations' issue, not a legal

_____

[2]   The New Mexico Developmental Disabilities Code was amended as of July 1, 1977.   While the 1953 code in effect when Plaintiffs were committed provided only for court-ordered termination of involuntary commitments, the amended code provided for automatic lapse of commitments.

obstacle."   [*Id.*].

With respect to Plaintiffs' discharges and post-discharge placements in particular, Defendants discharged Plaintiffs JL, EH, and KC from the Training School, in Los Lunas, New Mexico, on March 23, 1979, and transferred them post-discharge to ENMRSH in Clovis, New Mexico.   [*Id.* ¶¶ 135, 192, 194, 299].   Defendants discharged DA from the Training School on January 17, 1976, and transported DA post-discharge from Los Lunas, New Mexico, to Clovis, New Mexico, [*id.* ¶ 271].   Defendants discharged RH on May 9, 1980, directly from his aftercare placement at Petty boarding house, but Defendants did not transfer him to ENMRSH or elsewhere because they did not know his whereabouts.   [*Id.* ¶¶ 7, 203].   Defendants "lost track" of RH, but nonetheless "discharged" him *ex parte*.   [*Id.*].   Defendants discharged GS from the Training School on October 22, 1980.   [*Id.* ¶ 331].   Defendants transported GS post-discharge from Ft. Stanton to his mother's home in Clovis, New Mexico, with day habilitation services by ENMRSH. [*Id.* ¶¶ 82, 334].

Defendants did not ask JL, EH, and KC for consent to be discharged from the Training School, transferred from Los Lunas to Clovis, and placed at ENMRSH, did not ask DA for consent to be discharged from the Training School and transferred from Los Lunas to Clovis, and did not ask GS for consent to be discharged from the Training School, transferred from Ft. Stanton to Clovis, and placed in his mother's home in Clovis.   [*Id.* ¶¶ 137, 193, 194, 302, 274, 334].   JL, EH, KC, DA, and GS did not agree—either themselves or through a third-party surrogate decision maker—to be discharged, transported, and/or placed in third-party settings.   [*Id.* ¶¶ 137, 193, 302, 274, 334].   At the time of her discharge, KC wished to return to her home town of Santa Fe.   [*Id.* ¶ 302].

"Training School administrators deliberately decided not to appoint surrogate decision makers for its residents . . . prior to [discharge].   Training School residents were not even informed that they were no longer clients of the Training School."   [*Id.* ¶ 73].   Defendants even went so far as to "fraudulently conceal[] from Plaintiffs their actions in 'discharging' Plaintiffs from the Training School, depriving Plaintiffs of any opportunity to know when Defendants had abandoned them."   [*Id.* ¶ 369].

In addition, Defendants discharged Training School residents routinely without court process.   [*Id.* ¶ 81].   Thus, no court has rescinded the involuntary commitments of Plaintiffs JL, EH, RH, and KC.[3]   [*Id.*].   In contrast, while DA was discharged pursuant to an order dated January 13, 1976, this discharge was *ex parte*, with no notice to DA or a surrogate, and was "the result of an inaccurate and/or incomplete disclosure to the court of DA's condition or circumstances."   [*Id.* ¶ 272].   Moreover, the judicial paperwork to "discharge" DA did not provide the court with notice of Defendants' plan to transfer custody of Plaintiffs from the Training School to third parties, and it showed that no surrogate decision makers were informed of the "discharge" or transfer of custody to third parties.   [*Id.* ¶¶ 82, 331, 332].   Likewise, while Defendants effectuated judicial paperwork to "discharge" GS, the paperwork was *ex parte* and it did not provide the court with notice of Defendants' plan to transfer custody of GS from the Training School to third parties, and it showed that no surrogate decision makers were informed of the "discharge" or transfer of custody to third parties.   [*Id.* ¶¶ 82, 331, 332].   Similarly, Defendants did not provide GS or a surrogate with notice or any other due process protections and Defendants provided an inaccurate and/or incomplete assessment of GS's condition or

---

[3]   In the case of JL, Defendant Mateju simply sent written correspondence to the court indicating that JL had been "discharged from our roles (sic)."   [Doc. 211 ¶¶ 12, 70].

circumstances to the Court.   [*Id.* ¶ 332].

Plaintiffs, with the exception of GS who left ENMRSH in 2010, have remained at ENMRSH through at least the date of the filing of the complaint.   [*Id.* ¶ 10].

V.   The Alleged Deprivations of Plaintiffs' Liberty and Property Interests.

The complaint alleges that while at ENMRSH and/or other third-party placements, Plaintiffs suffered various forms of abuse, neglect, and economic exploitation.   [*Id.* ¶¶ 112-22]. "Plaintiffs were physically and medically neglected during their placements."   [*Id.* ¶ 99].   At Petty boarding home, RH was forced to sleep outside if he failed to return on time, regardless of the temperature.   [*Id.* ¶ 7].   "ENMRSH . . . failed to address Plaintiffs' critical medical needs," [*id.* ¶ 112], "failed to ensure that Plaintiffs receive adequate behavioral supports," [*id.* ¶ 113], "failed to provide Plaintiffs with support for their daily living needs and activities, including but not limited to assistance with securing nutritious food, preparing healthy meals, daily personal hygiene and environmental cleanliness, and mobility and transportation," [*id.* ¶ 114], "failed to address Plaintiffs' need for periodic nutritional assessment[ and] assistance" and "failed to ensure that Plaintiffs JL, RH, EH, and KC have sufficient healthy food or access to food each day," [*id.* ¶ 115], failed to place Plaintiffs in safe housing, [*id.* ¶ 118], "failed to provide or ensure appropriate supported employment for Plaintiffs," [*id.* ¶ 117], "failed to provide Plaintiffs with meaningful activity during the day," [*id.* ¶120], and "coerced Plaintiffs to cut off ties to potential advocates," [*id.* ¶ 121].

Plaintiffs also were subject to financial exploitation at ENMRSH.   "ENMRSH has operated as representative payee for Plaintiffs, and, instead of acting consistent with its fiduciary duty to "utilize[e] Medicaid funds and other financial resources provided for the purpose of assisting Plaintiffs . . . , for the ostensible benefit of Plaintiffs . . . , ENMRSH Defendants instead

used these financial resources to benefit themselves and their employees."   [*Id.* ¶ 119]. "ENMRSH Defendants converted Plaintiffs' social security checks, for their own use and did not account for their expenditures or spend all the funds for the benefit of Plaintiffs."   [*Id.* ¶ 100].

The complaint alleges that Defendants "were aware of the likelihood of abuse . . . as a result of their dumping of residents without due process or judicial or Training School oversight," [*id.* ¶ 96], and charges Defendants with "caus[ing] or permitt[ing]" this abuse and neglect, [*id.* ¶ 8]. The complaint alleges that Defendants failed to protect Plaintiffs over the 30-year period that Plaintiffs were placed at ENMRSH.   [*Id.* ¶ 97].   The complaint alleges that Defendants "permitt[ed] their agents, the ENMRSH Defendants, to deprive Plaintiffs of social services, decent, safe, and sanitary housing, the opportunity to associate with their family or peers, Medicaid benefits, social security benefits, adequate safety, medical, dental and psychological care, rehabilitative, educational and vocational services, day habilitation and therapy, and their basic human rights."   [*Id.*].

The complaint further alleges that had Defendants placed Plaintiffs with "a professionally managed provider agency that complied with applicable laws and regulations," they would have received the services they needed.   [*Id.*].   Moreover, the complaint alleges that "[i]f Plaintiffs had continued to reside at the Training School, under law, a vast array of services and legal protections would have been available to them," and "[a]fter placing Plaintiffs in outside settings and/or after purportedly discharging them from aftercare, . . . Defendants ceased providing these needed services and protections to Plaintiffs and deprived Plaintiffs of these services and of their legal rights to adequate care and treatment."   [*Id.* ¶ 98].

With respect to financial exploitation, the complaint alleges that Defendants "facilitated the transfer of JL's, EH's, DA's, KC's, and GS's social security checks to ENMRSH . . . without

having ENMRSH . . . appointed as Plaintiffs' conservator, and with deliberate indifference to whether ENMRSH Defendants were using or intended to use these social security funds for the benefit of Plaintiffs."   [*Id.* ¶ 93].   "[T]he transfer of these social security funds to ENMRSH Defendants was without judicial oversight, or . . . Defendants misled the court regarding the future use of these social security funds."   [*Id.* ¶ 94].   Defendants "were aware that . . . ENMRSH . . . intended to keep Plaintiffs' federal benefits[] and approved the arrangement."   [*Id.* ¶ 101].

## **STANDARD**

"The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."   *Mobley v. McCormick,* 40 F.3d 337, 340 (10th Cir. 1994).   The sufficiency of a complaint is a question of law, and, in ruling on a Rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations, view those allegations in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor.   *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   *Id.*   Rather, to survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff's complaint must contain sufficient facts which, if assumed to be true, state a claim to relief that is plausible on its face.   *See Twombly*, 550 U.S. at 570.

Once a defendant raises the defense of qualified immunity in a Rule 12(b)(6) motion, the burden shifts to the plaintiff to (1) come forward with allegations sufficient to show that the defendant's alleged actions violated a federal constitutional or statutory right and (2) show that the

federal right was clearly established at the time of the challenged conduct.   *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 646 (10th Cir. 1988).   "'[T]he right [an officer is] alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense:   The contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right.'"   *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001) (quoting *Anderson v. Creighton*, 483 U.S. 635 (1987)).   For a right to be "particularized," there "ordinarily . . . must be a Supreme Court or Tenth Circuit opinion on point," *Garramone v. Romo*, 94 F.3d 1446, 1451 (10th Cir. 1996), or "the weight of authority from other courts [must] show[] the right [to] be as plaintiff maintains," *Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003).   A district court has "the freedom to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'"   *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009)).

## DISCUSSION

This Memorandum Opinion and Order resolves four motions to dismiss:   the Motion to Dismiss Procedural Due Process Claims, the Motion to Dismiss Court Access Claims, the Motion to Dismiss First Amendment Claim, and the Motion to Dismiss Fourth Amendment Claim.   In each motion, Defendants contend that qualified immunity shields them from suit.   The Court addresses each motion in turn.

I.      Motion to Dismiss Procedural Due Process Claims [Doc. 267].

Plaintiffs assert claims against Defendants pursuant to 42 U.S.C. Section 1983 for violation of Plaintiffs' Fourteenth Amendment right to procedural due process.   Defendants argue that they are shielded by qualified immunity from these claims.   Specifically, Defendants contend that they

12

are immune from claims that Defendants' actions of temporarily placing Plaintiffs on aftercare in third-party settings, permanently discharging Plaintiffs from the Training School, and transferring Plaintiffs post-discharge to ENMRSH deprived Plaintiffs of their liberty interests in (1) freedom from undue restraint; (2) personal security and safe conditions of confinement; (3) minimally adequate food, clothing, shelter, and medical care; (4) habilitation and training services; (5) placement in the least restrictive setting; and (6) the opportunity to associate with family and peers.[4]   Defendants also contend that they are immune from claims that Defendants deprived Plaintiffs of their property interests in (1) state-funded care, custody, employment, education, and training provided for by the New Mexico Developmental Disabilities Code in effect at the time of Plaintiffs' commitments to the Training School, and (2) in receiving certain Social Security, Medicaid, and Medicare payments and benefits.

      A.    <u>Plaintiffs have not Sufficiently Alleged that Discharge from the Training School Infringed Clearly Established Protected Liberty Interests but have Sufficiently Alleged that Discharge did Impinge Clearly Established Protected Property Interests</u>.

Defendants contend that Plaintiffs have failed to allege facts establishing that their discharges from the Training School infringed interests encompassed by the Fourteenth Amendment's protection of liberty and property.   Alternatively, Defendants assert that, even if the discharges deprived Plaintiffs of a protected right, Defendants nonetheless are entitled to qualified immunity because Plaintiffs have failed to show that the interests protected were clearly established.

---

[4]   The Court addresses Plaintiffs' Fourteenth Amendment access to courts claim in the context of ruling upon Defendants' Motion to Dismiss Court Access Claims.   *See infra* § II.

1.      Plaintiffs have not Sufficiently Alleged that Discharge from the Training
        School Deprived Them of a Protected Liberty Interest.

While "[t]he Fourteenth Amendment prohibits any state deprivation of life, liberty, or property without due process of law," *Ingraham v. Wright*, 430 U.S. 651, 672 (1977), "[t]he requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property," *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972).   "[T]o determine whether due process requirements apply in the first place, [a court] must look not to the 'weight' but to the nature of the interest at stake."   *Id.* at 570-71 (citation omitted).   The identification of the interests that are protected by the due process clause is a question of federal constitutional law.   *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).   Only if challenged conduct implicates an interest protected by the Fourteenth Amendment must a court determine what procedures are due.   *See Ingraham*, 430 U.S. at 672.

Defendants contend that Plaintiffs have not alleged facts establishing that their discharges from the Training School implicated a liberty interest protected by the due process clause.   The Supreme Court has not attempted to define with exactness the liberty guaranteed by the Fourteenth Amendment, but "'[w]ithout doubt, it denotes not merely freedom from bodily restraint.'"   *Roth*, 408 U.S. at 572 (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (additional citations omitted).   "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies."   *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted).

According to Defendants, while Plaintiffs possessed certain clearly established liberty interests in freedom from undue restraint, personal security, and to minimally adequate food,

shelter, and medical care while in state custody, Plaintiffs have not stated a constitutional violation because these liberty interests terminated upon Plaintiffs' discharges from state custody. Defendants also argue that even if Plaintiffs had a liberty interest in receipt of habilitation services, placement in the least restrictive setting, and the opportunity to associate with family, these interests existed only while Plaintiffs remained in state custody.   Defendants reason that because Plaintiffs had no liberty interest in remaining committed to state custody and no liberty interest in receiving substantive services once discharged from state custody, Plaintiffs have not alleged facts establishing that their discharges implicated a constitutionally-protected liberty interest.   The Court agrees.

The Supreme Court specifically held in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), that a state has "no constitutional duty to provide substantive services for those within its border."   *Id.* at 196.   The *DeShaney* Court explained that the due process clause of the Fourteenth Amendment "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security;" the clause "forbids the State itself," through its own affirmative conduct, of depriving individuals of life, liberty, or property without 'due process of law;'" and that the clause was "intended to prevent government from abusing [its] power, or employing it as an instrument of oppression."   *Id.* at 195-96 (internal quotation marks and citations omitted).   The *DeShaney* Court recognized that, "[c]onsistent with these principles, [the Supreme Court's] cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."   *Id.* at 196 (citations omitted).   From there, the Court reasoned that "[i]f the Due Process Clause does not require the State to provide its citizens with particular protective services,

it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them."   *Id.* at 196-97.

While a state has no general duty to provide substantive services to its citizens, it does have a duty to provide services to those it has involuntarily committed to state custody.   The *DeShaney* Court explained that when "the state takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."   *Id.* at 199-200; *see Youngberg v. Romeo*, 457 U.S. 307, 317 (1982) ("When a person is institutionalized—and wholly dependent on the State[—]a duty to provide certain services and care does exist.").   This duty arises because the involuntarily committed person is "unable by reason of the deprivation of his liberty [to] care for himself," and "it is only just that the State be required to care for him."   *DeShaney*, 489 U.S. at 199 (internal quotation marks omitted) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)) (additional citation omitted).   "The rationale for this principle is simple enough:   when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the . . . Due Process Clause."   *Id.* at 200.   This affirmative duty to provide substantive services arises, however, only because the state has "restrain[ed] the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty"—and it is the restraint of an individual's ability to act on his or her own behalf that is the deprivation of liberty, not the failure to provide substantive services.   *Id.*

Thus, consistent with these principles, the Court concludes that when the state terminates an involuntary commitment, the rationale for imposing a special obligation upon the state—*i.e.,*

16

that the state has prevented the person from caring for himself or herself—likewise expires. Therefore, upon termination of an involuntary commitment, the corresponding duty to provide substantive services that arose upon commitment necessarily also ceases, and the general rule that a state has no duty to provide its citizens with affirmative services or protection again controls. *See id.* at 201 (explaining "the State does not become the permanent guarantor of an individual's safety by having once offered him shelter," and reasoning that simply because "the State once took temporary custody of [of a minor child pending investigation of suspected child abuse] does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all").

To the extent that Plaintiffs allege that Defendants deprived them of a protected liberty interest by discharging them from the Training School and denying them the corresponding protection and care that accompanied their involuntary commitments, the Court holds that the nature of the interests alleged—*i.e.*, interests in remaining committed to state custody, being entitled to state protection, having the state provide food, shelter, medical care, and habilitation services, being placed in the least restrictive setting, and receiving the opportunity to associate with family and peers—is the equivalent of a claim of entitlement to receive substantive services from the state. Upon Plaintiffs' discharges, however, *DeShaney* compels the Court to conclude that Plaintiffs no longer possessed liberty interests in receiving any substantive services from the state. For these reasons, Plaintiffs have failed to allege that their discharges from the Training School deprived them of any constitutionally-protected liberty interest.

2.      Plaintiffs Have Sufficiently Alleged that the Discharges Deprived Them of a Clearly Established Protected Property Interest.

The complaint alleges that Defendants' conduct of discharging Plaintiffs deprived Plaintiffs of a protected property interest in being committed to state custody and receiving benefits arising out of that commitment.   Defendants maintain that they are shielded by qualified immunity from this claim because Plaintiffs have not, consistent with the first part of their qualified immunity burden, alleged facts establishing the existence of a property right, *i.e.*, namely, that state law created a legitimate claim of entitlement to continued commitment and receipt of benefits.   Defendants further assert that even if state law created a protected property interest, Defendants nonetheless are immune because Plaintiffs have not shown, consistent with the second part of their burden, that it was clearly established at the time of Plaintiffs' discharges that the deprivation of the property interest was protected by the Fourteenth Amendment.

a.      Plaintiffs Have Alleged a Protected Property Interest.

Defendants assert that Plaintiffs have not alleged facts establishing that they had a protected property interest within the meaning of the Fourteenth Amendment because, according to Defendants, Plaintiffs did not have a legitimate claim of entitlement to any medical benefits, habilitation services, or other government-funded treatments.   Defendants properly assert that, to avoid dismissal, Plaintiffs must allege facts showing that they possessed a constitutionally-protected right to the continuation of the benefits granted under state law, or, stated differently, that they had a legitimate claim of entitlement to the benefits.   *See Loudermill*, 470 U.S. at 538.

Plaintiffs contend that the 1953 New Mexico Developmental Disabilities Code in effect at the time of their commitments created a property interest in Plaintiffs' continued commitment to

18

state custody and continued receipt of benefits. The viability of Plaintiffs' due process claim depends on Plaintiffs having had a property right to remain in state custody and to receive the corresponding benefits of state custody. If Plaintiffs had such a right, Defendants could not deprive them of it without due process.

The due process clause protects the property interests of involuntarily committed persons. "Property interests . . . are not created by the Constitution," but "[r]ather[] are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577; *see also Goss v. Lopez*, 419 U.S. 565, 572-73 (1975). The New Mexico statute in effect at the time of Plaintiffs' commitments plainly created such an interest.

At the time of Plaintiffs' commitments, the 1953 New Mexico Developmental Disabilities Code provided for both involuntary and voluntary commitments to the Training School. With respect to involuntary commitment, the statute provided that if a court, after a hearing and examination, determined a "person . . . to be mentally defective, as defined in section 34-3-1," *i.e.*, as a person "incapable of managing himself and his affairs" and "requir[ing] supervision, care and control for his own welfare, or for the welfare of others, or for the welfare of the community," "the court may enter its temporary order of commitment of the individual . . . for a period not to exceed thirty [30] days." N.M. Stat. Ann. § 34-3-6(B), § 34-3-1 (1953). If during the 30-day temporary commitment the hospital evaluation board determines that institutional care is warranted because the person "is . . . a mentally defective person," the hospital board may then certify this determination to the court and the court thereafter may enter a "regular order of commitment." *Id.* § 34-3-6.1(B), 6.2(C). The complaint alleges that Plaintiffs, with the exception of GS, were

19

involuntarily committed to the Training School by court order because they met the foregoing criteria for admission.  GS, in contrast, was committed to the Training School pursuant to the statute's provisions for voluntary commitments, which provide that, "[t]o the extent that accommodations are available, the [Training School] shall admit to the institution mentally defective persons voluntarily admitted to the institution by their parents, guardians or other persons having custody and control."  *Id.* § 34-3-10.

Once courts admitted Plaintiffs to the Training School, the New Mexico code then in effect established the benefits to which Plaintiffs were entitled.  The statute provided that it "establishe[s] and hereinafter maintain[s] by th[e] state an institution to be known as 'Los Lunas Hospital and Training School' for the care, custody, employment, education and training of "mental defectives."  *Id.* § 34-3-2.  The statute provided that the Training School would be staffed by "a principal and a sufficient number of qualified teachers who are certified by the state board of education."  *Id.* § 34-3-5(B).  The statute further provided, with respect to those involuntarily committed, that a court "shall inquire into the ability of [the involuntarily committed inmate's] parents, guardians or custodians to contribute to the maintenance and support of such persons," but also that "[w]here no order of court is entered regarding . . . expenses and maintenance, . . . the expenses and maintenance of the inmate" "shall be defrayed" "by the institution."  *Id.* § 34-3-8(A).  The statute further provided, with respect to those voluntarily committed, that the Training School "shall inquire as to the financial capability of the mentally defective person's parents, guardians or other persons having custody of a voluntarily admitted patient, and may . . . require nonindigent parents, guardians or other persons having custody to make reasonable contributions toward the support and maintenance of the mentally defective

person . . . ; Provided, however, that such contributions shall be based on ability to pay." *Id.* § 34-3-10.

The complaint contains no allegations of a court order requiring Plaintiffs' parents or any other third-party to pay Plaintiffs' expenses, or that the Training School required GS's parents or custodians to contribute to his expenses. Thus, construing the complaint in the light most favorable to Plaintiffs, the Court assumes that there were no such orders or required contributions. Accordingly, upon their commitments, the statute granted Plaintiffs the right to state-funded care, custody, employment, education from certified teachers, and training.

The Court holds that the affirmative provisions in the 1953 Developmental Disabilities Code granting Plaintiffs state-funded benefits created a claim of entitlement to benefits grounded in the statute defining Plaintiffs' eligibility. The Supreme Court has recognized that "[c]ertain attributes of 'property' interests protected by procedural due process emerge from [its] decisions." *Roth*, 408 U.S. at 577. For example, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* Furthermore, "[t]he hallmark of property, the [Supreme] Court has emphasized, is an individual entitlement grounded in state law, which cannot be removed except for cause." *Setlif v. Mem. Hosp.*, 850 F.2d 1384, 1395 (10th Cir. 1988) (internal quotation marks and citation omitted). Plaintiffs' expectations, upon their commitments pursuant to the New Mexico statute, were not unilateral and they did not constitute a mere abstract need or desire. Rather, the New Mexico statute in effect at the time of Plaintiffs' involuntary commitments clearly granted Plaintiffs, upon commitment, the right to receive state-funded benefits, and Plaintiffs, under the statute, had a clear

right to rely upon this entitlement.  The Fourteenth Amendment protects precisely this type of statutorily-induced reliance.

That the statute created a claim of entitlement protected by the Fourteenth Amendment is demonstrated by the code's provisions explicitly providing that an involuntary commitment may be rescinded only for "good cause," only upon a determination by the court originally committing the inmate to state custody, and only upon a recommendation from the institution that the inmate is capable of adjusting "satisfactorily" to normal life.  N.M. Stat. Ann. § 34-3-7(A).  These limitations on the right to discharge, in conjunction with the benefits conferred, created a property interest grounded in state law that could not be removed without due process of law.[5]

Defendants argue that, because the New Mexico legislature amended the Developmental Disabilities Code, and, commencing in July of 1977, the procedures for commitment and discharge from the Training School changed, Plaintiffs were not, in fact, entitled to remain committed to state custody or to receive continuing benefits arising from that commitment. Defendants argue that the amended code limited the duration of a court's order of involuntary commitment to "a period not to exceed six months," and that the code provided that, at the expiration of this six-month period, a client of the Training School could be detained only after a new order was entered, pursuant to a new commitment hearing.  *See* N.M. Stat. Ann. § 43-1-12(C), (D) (1977).

---

[5]   Defendants do not argue, and the Court therefore does not consider, whether GS's status as voluntarily committed to the Training School defeats a claim that GS's entitlement was constitutionally protected.  Because Defendants do not present argument or authority on this question, the Court does not consider whether GS's procedural due process claim premised upon the deprivation of a property interest arising under the 1953 statute is viable.  *See* D.N.M.LR-Civ. 7.3.

That the code's provisions pursuant to which Plaintiffs were admitted to the Training School were repealed by the New Mexico legislature and that new criteria for admissions were passed and in effect on the date of Plaintiffs' discharges is not determinative of the constitutional question of procedure before the Court.[6]   *See, e.g.*, *Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584, 591 n.2 (10th Cir. 1999) ("[A] state statute does not and cannot define the scope of constitutional rights.").   Rather, although independent sources such as state law create property rights, "federal constitutional law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause."   *Loudermill*, 470 U.S. at 541.   Thus, Plaintiffs need not establish that they were, in fact, entitled to remain in state custody or were, in fact, entitled to continue receiving benefits associated with their commitments to state custody. Likewise, this Court need not determine whether the 1953 criteria for discharge governed Plaintiffs' discharges, or whether the criteria in the amendments in effect after 1977 instead applied.   The only question before the Court is one of procedure, *i.e.*, whether state law created a property right that is protected by the Fourteenth Amendment, and, if so, what procedures were required to afford Plaintiffs the opportunity to establish their eligibility to receive the property right.   By holding that the 1953 statute created such a protected right, the Court recognizes only that Plaintiffs were entitled, by virtue of the Fourteenth Amendment's protections, to notice and an opportunity to be heard so that they might persuade some other tribunal that they were entitled to remain involuntarily committed to state custody and receive corresponding state-funded benefits. *Cf. Roth*, 408 U.S. at 577 (explaining that to hold that a protected property interest exists is not the

---

[6]   While Defendants contend that their discharges of Plaintiffs were legal because, pursuant to the amended code, Plaintiffs' involuntary commitments lapsed automatically after six months, Defendants do not explain why, if the 1977 code rendered the court-ordered commitments null and void after six months, Defendants did not discharge Plaintiffs sooner as required by their interpretation of the amended code's applicability.

equivalent of a substantive determination that a plaintiff, in fact, is eligible for receipt of the benefit, but rather is a matter of procedure that grants the plaintiff the right to a hearing at which he or she might attempt to persuade a tribunal that the plaintiff is, in fact, eligible to receive benefits).

The Court's conclusion is consistent with numerous Supreme Court decisions holding that a state, having at one time extended a benefit, cannot thereafter terminate the benefit in the absence of fundamentally fair procedures.   For example, in *Goldberg v. Kelly*, 397 U.S. 254, 262, 264 (1970), the Supreme Court confirmed that a person receiving welfare benefits under statutory and administrative standards defining eligibility has an interest in continued receipt of those benefits safeguarded by procedural due process.   In *Slochower v. Board of Education*, 350 U.S. 551, 556-57, 559 (1956), the Supreme Court held that a public college professor dismissed from an office held under tenure provisions had an interest in retaining his position safeguarded by due process.   *See also Loudermill*, 470 U.S. at 538-39 (holding that an Ohio statute "plainly create[d]" a property interest because respondents, under the statute, were classified civil service employees entitled to retain their positions during good behavior who could not be dismissed except for cause).   In *Goss v. Lopez*, 419 U.S. 565, 573-74 (1975), the Supreme Court held that a state having "chosen to extend the right to an education to people of appellees' class generally," and having a compulsory attendance law, "may not withdraw that right on grounds of misconduct absent fundamentally fair procedures to determine whether the misconduct has occurred."   In *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972), the Supreme Court held that although a parolee has no constitutional right to that status, once granted, the status cannot be revoked without due process protections.   And, in *Wolff v. McDonnell*, 418 U.S. 539, 556-57, 558 (1974), the Supreme Court held that when a state law grants prisoners a right to a shortened sentence based upon the accumulation of good-time credits and recognizes that the deprivation of the credits is a sanction

24

for major misconduct, the state cannot cancel those credits without due process of law even though the benefits were not mandated in the first instance by the Constitution.   Similarly, where, as here, New Mexico involuntarily commits a class of persons that it determines are incapable of managing themselves or their affairs, and affords to that class rights to state-funded care, custody, employment, education, and training, all of which cannot be taken away without cause, New Mexico cannot withdraw those rights without due process of law.   While the Constitution did not require New Mexico to provide these substantive rights in the first place, once New Mexico opted to grant these benefits, the Fourteenth Amendment protected these property interests from arbitrary deprivation.[7]

Defendants' arguments to the contrary are unavailing.   First, Defendants contend that the statute provides only for the "*establishment* of an institution for the purpose of providing 'care,'" and that "[i]t in no way provides for the creation of a right to specific benefits" or "defines standards of eligibility for the receipt of specific benefits as required by *Roth*."   [Doc. 285 at 15-16].   Although the statute does provide for the establishment of an institution, it also grants benefits to those committed to the Training School.   In particular, the statute provides to those eligible for involuntary commitment the benefits of state-provided "care, custody, employment, education and training."   N.M. Stat. Ann. § 34-3-2 (1953).   The statute also provides that these

---

[7]   The Court's decision also is consistent with that in *J.M. et al. v. New Mexico Department of Health et al.*, No. 07-CV-0604 RB/ACT, [Doc. 224], in which United States District Judge Robert C. Brack denied a motion to dismiss JM's procedural due process claim brought by Defendant Beth Schaefer premised upon the deprivation of benefits provided by the Training School.   *See* Mem. Op. & Order at 6-7, 12, 14-15.   The court held that "JM had a property interest in the educational benefits, care, and treatment which she was entitled to receive at the Training School during the period of time she was committed to state custody" and that "JM was allegedly deprived of this property interest by being sent to unlicensed third party settings."   *Id.* at 6-7.   The court therefore concluded "that Plaintiffs' allegations regarding deprivations of JM's procedural due process rights[] are sufficient to state a procedural due process claim, pursuant to § 1983, against Ms. Schaefer upon which relief can be granted."   *Id.* at 7.

benefits shall be funded by the state unless provided for otherwise by court order.  *See id.* § 34-3-8

(providing for state funding of benefits for those involuntarily committed unless ordered otherwise

by a court); *compare id.* § 34-3-10 (providing for state funding of benefits for those voluntarily

committed based upon ability to pay).

      Moreover, the statute clearly establishes the standards for eligibility for involuntary

commitment to the Training School as well as receipt of state-funded benefits of care, custody,

employment, education, and training.   The criteria for involuntary commitment include an initial

court hearing and examination, a finding by the court that the person meets the definition of

"mental defective," the issuance of a 30-day temporary order of commitment, a finding by the

hospital board that the person meets the definition of "mental defective," a certification by the

hospital evaluation board to the court confirming the board's conclusion, and the entering by the

court of a final order for "regular" commitment.   *Id.* §§ 34-3-6(B), 34-3-1, 34-3-6.1(B),

34-3-6.2(C); *see also id.* § 34-3-8(B) (providing that to be eligible for commitment, the person or

his or her guardian must have been a legal resident of New Mexico for one year immediately

preceding the filing of the petition for commitment).   The statute further provides that the criteria

for state-funded care is a court inquiry into the ability of the committed person's parents,

guardians, or custodians to contribute to the resident's maintenance and support, and the failure of

a court to enter an order requiring contribution from parents or guardians.  *See id.* § 34-3-8(A)

(setting forth the standard for involuntarily-admitted residents); *see also id.* § 34-3-10 (setting

forth a similar standard for involuntarily-committed residents).

      Next, Defendants argue that "once Plaintiffs' indeterminate commitments to the Training

School lapsed pursuant to the repeal of that statute on July 1, 1977, the Training School had no

further right or legal obligation to detain JL, EH, RH, KC, and GS."   [Doc. 285 at 16].   As

explained above, the procedural due process inquiry does not require the Court to decide the merits of the question whether Plaintiffs, in fact, are eligible to receive the benefits arising out of their involuntary commitment to the Training School.   The only question before the Court is the procedural question whether the statute of commitment gave rise to a legitimate *claim* of a constitutionally-protected entitlement to the benefits conferred therein; if so, the Fourteenth Amendment grants Plaintiffs the right to notice and an opportunity to be heard on the substantive question of eligibility for receipt of benefits.

Finally, Defendants contend that Plaintiffs had no property right to receive habilitation services because those rights "were provided to individuals while in state custody, such as food, shelter, medical care, or even habilitation" and "necessarily . . . ceased when institutionalization ended."   [Doc. 285].   This argument confuses the issue of Plaintiff's alleged *liberty* interest in receiving habilitation services, discussed above, with Plaintiffs' claim that they have a *property* interest in receiving habilitation services.   *See supra* § I.A.1.   While the question whether Plaintiffs had a protected liberty interest in receiving habilitation services turns on Plaintiffs' status of being committed (or not committed) to state custody, in contrast, the question whether Plaintiffs had a protected property interest in receiving habilitation services does not turn on commitment status.   Rather, property rights are created by some independent source, such as a state law, which gives rise to a legitimate claim of entitlement.   Thus, the Court rejects Defendants' contention that Plaintiffs' discharges from the Training School vitiate Plaintiffs' property-based procedural due process claim.

                  b.        <u>Plaintiffs have Shown that the Property Right Infringed by Their Discharges was Clearly Established</u>.

Defendants argue that, even if Plaintiffs have alleged facts implicating the deprivation of a protected property interest, Defendants nonetheless are entitled to qualified immunity because Plaintiffs have failed to show that their alleged property right to state-funded benefits was clearly established at the time of their commitments.   The Court is not persuaded.

At the time Plaintiffs were discharged, the Supreme Court had clearly held that, once benefits to which an individual has a legitimate claim of entitlement are conferred, they cannot thereafter be terminated without fundamentally fair procedures.   *See Goldberg*, 397 U.S. at 262, 264; *Slochower*, 350 U.S. at 556-57, 559; *Goss*, 419 U.S. at 573-74; *Morrissey*, 408 U.S. at 482; *Wolff*, 418 U.S. at 556-57, 558.[8]   These cases provided Defendants with notice that the benefits of state-funded care, custody, employment, education, and training conferred upon inmates by the 1953 Developmental Disabilities Code constituted protected property rights of which Plaintiffs could not be deprived without due process of law.   These cases also clearly established a general framework requiring the court to examine the contours or attributes of a property right, including whether it gives rise to a legitimate claim of entitlement and whether that entitlement cannot be removed except for cause, to determine whether that right is entitled to Fourteenth Amendment protection.   *See Roth*, 408 U.S. at 577; *Setlif*, 850 F.2d at 1395.   Defendants were on clear notice at the time of Plaintiffs' discharges that a court would apply this framework to determine whether Defendants' conduct deprived Plaintiffs of a state-created property right and if so, would conclude that Plaintiffs were entitled to due process in conjunction with the deprivation.

---

[8]   Tenth Circuit authority also placed Defendants on notice that Plaintiffs had a protected property interest.   *See, e.g.*, *Hatch v. Goerke*, 502 F.2d 1189, 1194-95 (10th Cir. 1974) (reasoning that "the opportunity to receive an education" is a "protected interest" of which a public school student cannot be deprived without due process of law).

It is of no consequence that neither the Supreme Court nor the Tenth Circuit have specifically held that benefits conferred upon those involuntarily committed to state custody, under a statute prohibiting the termination of that commitment absent good cause, are protected property rights.   Although ordinarily for the law to be clearly established there must be a Supreme Court or Tenth Circuit decision on point or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains, the Supreme Court has confirmed that a plaintiff need not find a case declaring the very action in question unlawful.   *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).   Further, the Tenth Circuit has explained that "[a] plaintiff may . . . carry the burden of demonstrating a right is clearly established by citing cases that have a sufficient degree of factual correspondence to enable a reasonable offic[ial] to know that the officer's acts violated the plaintiff's constitutional . . . rights."   *Kerns v. Bader*, 663 F.3d 1173, 1187 (2011) (citation omitted), *cert. denied*, 133 S. Ct. 645 (2012)).

Here, Defendants argue that Plaintiffs' cases stand only for discrete applications of law to narrow and specific factual circumstances.   The Court disagrees.   To the contrary, the Supreme Court cases cited by Plaintiffs have a sufficient degree of factual correspondence to enable a reasonable official in Defendants' position to know that Plaintiffs possessed protected property rights in their commitments and in the benefits of state-funded care arising in conjunction with their commitments.   The Court thus rejects Defendants' contention that Plaintiffs failed to satisfy their qualified immunity burden of showing that the law was clearly established at the time of Plaintiffs' discharges.

      B.     <u>Plaintiffs have Sufficiently Alleged that Transfer from the Training School to Third-Party Settings Infringed Some, but Not All, of Plaintiffs' Clearly Established Interests</u>.

The complaint not only challenges Plaintiffs' *discharges* from state custody but also Defendants' aftercare and post-discharge *transfers* of Plaintiffs to ENMRSH and/or other third-party providers.   Thus, the Court must consider whether Plaintiffs have sufficiently alleged that transfer from the Training School to third-party settings infringed their clearly established interests.

      1.     <u>Plaintiffs have Sufficiently Alleged that Defendants' Post-Discharge (but not Aftercare) Transfer of Plaintiffs to ENMRSH or Other Third-Party Settings Deprived Plaintiffs of a Clearly Established Liberty Interest in Freedom from Undue Restraint</u>.

Although the Court has held that that Defendants' *discharges* of Plaintiffs from state custody did not implicate a protected liberty interest in freedom from undue restraint, Plaintiffs also allege that, post-discharge, Defendants physically transported Plaintiffs (with the exception of RH) from Los Lunas to Clovis, New Mexico, and placed Plaintiffs in Clovis with ENMRSH or other third-party setting, without providing Plaintiffs with notice of the discharges and transfers, without obtaining Plaintiffs' consent for the discharges and transfers, and without giving Plaintiffs any choice regarding their placements.   Furthermore, Plaintiffs allege that even if Defendants had given Plaintiffs notice or a choice, because of Plaintiffs' developmental disabilities, Plaintiffs were unable to consent voluntarily and competently to placement in a third-party setting, and that Defendants therefore should have provided notice to and obtained consent from substitute decision makers with capacity to make decisions on Plaintiffs' behalf.

Freedom from restraint is one of the historic liberty interests protected by the Fourteenth Amendment.  *See Ingraham*, 430 U.S. at 672-73; *Youngberg*, 457 U.S. at 315.  This liberty

interest did not arise because of Plaintiffs' institutional confinement but rather existed prior to their commitments, remained intact during their commitments, and continued after their discharges from involuntary commitment. *See, e.g.*, *id.* (explaining that the "historic" rights to personal security and freedom from bodily restraint are "not extinguished by lawful confinement"); *Thomas S. v. Morrow*, 781 F.2d 367, 374 (4th Cir.) (explaining that "the liberty interests protected in *Youngberg* did not arise because of the institutional confinement," but "[r]ather, the Court's premise was that involuntary commitment and other lawful confinement do not extinguish pre-existing liberty interests in safety and freedom from bodily restraint) (internal quotation marks and citation omitted), *cert. denied*, 476 U.S. 1124 (1986), *and* 479 U.S. 869 (1986).

Although Plaintiffs' liberty interest in freedom from restraint was not extinguished by commitment, while Plaintiffs were involuntarily committed to state custody, Defendants necessarily were justified in restraining Plaintiffs' freedom.   When Defendants severed the state's custody over Plaintiffs, however, they no longer had any justification for restraining Plaintiffs' freedom.   Yet Defendants nonetheless retained physical custody over Plaintiffs, transported Plaintiffs across the state, and placed Plaintiffs at ENMRSH or other third-party settings.

In *In re Gault*, 387 U.S. 1, 27 (1967), the Supreme Court held that due process protections are required when a child is "committed to an institution [for juvenile delinquency] where he may be restrained of liberty," and that it is of "no constitutional consequence—and of limited practical meaning—that the institution to which he is committed is called an Industrial School," for the "fact of the matter is that, however euphemistic the title," it is "an institution of confinement."  *Id.* Likewise, in *Heryford v. Parker*, 396 F.2d 393, 396 (10th Cir. 1968), the Tenth Circuit held that it is "the likelihood of involuntary incarceration—whether for the punishment as an adult for a crime, rehabilitation as a juvenile for delinquency, or treatment and training as a feeble-minded or

31

mental incompetent,"—that infringes the liberty interest of freedom from bodily restraint and that "commands observance of the constitutional safeguards of due process."   *Id.*

As in *Heryford* and *Gault*, Defendants' post-discharge actions of retaining physical custody over Plaintiffs, transporting them across the state, and placing them in a third-party setting, on the facts alleged, constituted an involuntary restraint of Plaintiffs' freedom.[9]   It is the nature of the restraint, rather than its extent, that is determinative.   Thus, whether Defendants sought to commit Plaintiffs by court order indeterminately, or, indeed, for any period of time, to a state facility such as the Training School, or whether Defendants simply restrained Plaintiffs' physical freedom by assuming physical custody over Plaintiffs from the time Defendants discharged Plaintiffs through the time of placement in a third-party setting, the nature of this conduct is the same.   And by the nature of their conduct, Defendants infringed Plaintiffs' constitutionally-protected liberty interest in their freedom.[10]   By failing to give Plaintiffs' notice

---

[9]   While Defendants go to great lengths to establish that under the 1977 amended code they were entitled, and indeed required, to discharge Plaintiffs from state custody and while they argue at length that their discharges of Plaintiffs were valid, the end result of the discharges is that Defendants no longer had any justification for retaining custody over Plaintiffs.   Post-discharge, Plaintiffs no longer were in state custody, yet Defendants nonetheless retained physical custody over Plaintiffs, transported Plaintiffs across the state, and placed Plaintiffs in third-party settings, all without Plaintiffs' consent, informed or otherwise, or Plaintiffs' knowledge of the ramifications of the discharges and transfers.   It is internally inconsistent for Defendants to assert that they had no legal justification for continuing Plaintiffs' involuntary commitments under the 1977 amendment while also asserting that they nonetheless were entitled, post-discharge, to transfer Plaintiffs across the state.

[10]   Because Defendants failed to inform Plaintiffs that they were free from involuntary commitment, on the facts alleged, it is as if Defendants effectuated a *de facto* re-commitment of Plaintiffs to state custody.   Plaintiffs allege that ENMRSH is a state actor, and on the facts pled Plaintiffs had no reason to believe that their ENMRSH placements were voluntary.   It is clear that, from Plaintiffs' perspective, their final placements at ENMRSH were no different from their third-party aftercare placements at ENMRSH.   Defendants had placed Plaintiffs (with the exception of GS) repeatedly on aftercare at ENMRSH only to return them to the Training School thereafter.   During these aftercare placements, Plaintiffs were still under court-ordered commitments that had not been, as of then, purportedly terminated by Defendants' discharges of

of their discharges from state custody and their corresponding freedom from their involuntary commitments, Defendants thus unduly restrained Plaintiffs' freedom, at a minimum, from the time of discharge from the Training School through the time of their placement at ENMRSH or other third-party setting.

In contrast, the Court does not find that Plaintiffs' aftercare placements deprived them of their freedom from undue restraint.  Defendants cannot be said to have unduly restrained Plaintiffs' freedom by placing Plaintiffs on aftercare, because Plaintiffs' court-ordered commitments provided sufficient justification for those placements.   For this reason, to the extent that Plaintiffs ground their procedural due process claim on the theory that Defendants' conduct of placing them on aftercare deprived them of their liberty interest in freedom from undue restraint, the Court holds that Plaintiffs have not alleged facts that implicate a protected interest.

2.    <u>Plaintiffs have Sufficiently Alleged that the Aftercare (but not Post-Discharge) Transfers Deprived Plaintiffs of Clearly Established Protected Liberty Interests in Personal Security and Minimally Adequate Food, Shelter, and Medical Care.</u>

Plaintiffs have alleged that, by transferring Plaintiffs to ENMRSH and other third-party providers, temporarily on aftercare (with the exception of GS) and post-discharge (with the exception of RH), Defendants deprived Plaintiffs of constitutionally-protected liberty interests in personal security and safe conditions of confinement and in minimally adequate food, shelter, and medical care.   Unsurprisingly, Defendants do not dispute that Plaintiffs possessed a constitutionally-protected liberty interest in their safety.   The Supreme Court repeatedly has

---

Plaintiffs from the Training School or by any court of law.   Moreover, that Defendants discharged Plaintiffs from the Training School and purported to sever the state's legal custody over Plaintiffs is of no consequence, for on the facts alleged Plaintiffs had no way of discerning that Defendants' post-discharge placements of Plaintiffs at ENMRSH were any different from their pre-discharge placements at ENMRSH on aftercare.

recognized that the right to be free from unjustified intrusions on personal security is one of the "historic liberties" protected by the Fourteenth Amendment.  *See Ingraham*, 430 U.S. at 672-73. Similarly, Defendants appropriately concede that the state had an obligation to ensure Plaintiffs' safety while Plaintiffs were in state custody.

Defendants, however, argue that Plaintiffs' allegations, if true, would fail to establish that Defendants' own conduct deprived Plaintiffs of their constitutionally-protected rights.  Rather, Defendants contend, the allegations in the complaint establish only that Defendants failed to protect Plaintiffs' from the conduct of ENMRSH—allegations which, they argue, are insufficient to state a claim.  In support of their argument, Defendants maintain that, under *DeShaney*, they had no continuing obligation *after Plaintiffs' discharges* to be the "guarantor" of Plaintiffs' safety, and thus their failure to protect Plaintiffs cannot provide the basis for a due process claim.

       a.     <u>Plaintiffs have Sufficiently Alleged that Placing Plaintiffs on Aftercare Deprived Plaintiffs of their Clearly Established Liberty Interests in Safe Conditions of Confinement and Minimally Adequate Food, Shelter, and Medical Care</u>.

As an initial matter, Defendants' argument ignores the fact that the complaint includes allegations that Defendants impinged their liberty interest in safe conditions of confinement and minimally adequate food, shelter, and medical care *prior* to discharging Plaintiffs from the Training School, by placing Plaintiffs (with the exception of GS) on aftercare at ENMRSH and other third-party settings.  Defendants' argument is simply inapplicable to these allegations.

As the Court explained in the context of evaluating whether Plaintiffs have alleged that Defendants' discharges of Plaintiffs from the Training School implicated protected liberty interests, while the state has no constitutional duty to provide substantive services for those within its border, an exception to this general rule applies when the state takes a person into its custody

and holds him there against his will.   *See supra* § I.A.1.   Under these circumstances of involuntary commitment to state custody, "the Constitution imposes upon [the state] a corresponding duty to assume some responsibility for [a committed person's] safety and general well-being."   *DeShaney*, 489 U.S. at 199-200; *see also Youngberg*, 457 U.S. at 317.   At the time Defendants placed Plaintiffs on aftercare, Plaintiffs were still remanded to the custody of the Training School by court order and Defendants had not purported, either lawfully or unlawfully, to discharge Plaintiffs from that custody.   Thus, because Plaintiffs were still institutionalized—and wholly dependent on the State—Defendants had a continuing duty to protect Plaintiffs and to provide Plaintiffs with food, shelter, clothing, and medical care.

The complaint alleges that while at ENMRSH and/or other third-party placements, Plaintiffs suffered various forms of abuse, neglect, and economic exploitation, including being placed in unsafe homes, being physically and medically neglected, having their critical medical needs ignored, and, in the case of RH, being forced to sleep outside regardless of temperature. The complaint also alleges that Defendants were the decision makers who temporarily removed Plaintiffs from the Training School and, despite knowing of the dangers awaiting Plaintiffs in aftercare, nonetheless placed them at ENMRSH or other third-party providers where Plaintiffs suffered these deprivations.   Specifically, the complaint alleges that Defendants "abandoned" Plaintiffs on aftercare with no protections against abuse, neglect, or exploitation; did not use any system to ensure that residents in aftercare would be safe; failed to establish any guidelines for the care of residents in aftercare; failed to implement any follow-up system to monitor the aftercare residents' conditions and need for services; failed to conduct periodic judicial review to determine whether Plaintiffs' aftercare placements were appropriate or whether their needs were being addressed; and, knowing that social workers failed to make required visits and ensure Plaintiffs'

well-being, acquiesced in the social workers' failure to follow policy.  These allegations are sufficient to state a claim that Defendants, who had legal custody over Plaintiffs and a corresponding duty to ensure Plaintiffs' safety and to meet Plaintiffs' basic needs, impinged Plaintiffs' liberty interests in safe conditions of confinement and minimally adequate food, shelter, and medical care.[11]

> b.  Plaintiffs have Failed Sufficiently to Allege that Transferring Plaintiffs Post-Discharge to ENMRSH Deprived Them of Liberty Interests in Personal Security and Minimally Adequate Food, Shelter, and Medical Care.

Defendants assert that Plaintiffs have not alleged facts establishing that Defendants deprived Plaintiffs of protected liberty interests in their personal security and to minimally adequate food, shelter, and medical care by placing Plaintiffs, other than RH and GS, at ENMRSH *after their discharges* from the Training School.  In support of that assertion, Defendants argue that, because the transfers occurred after Defendants discharged Plaintiffs from the Training School, Defendants no longer had a duty to provide Plaintiffs with affirmative protection or care.

In response to this argument, Plaintiffs first contend that, under New Mexico law, Defendants' discharges of Plaintiffs from the Training School did not effectively sever the state's custodial relationship with Plaintiffs.  To the contrary, Plaintiffs argue, they remain to this day under continuous, court-ordered, involuntary commitments and in the state's custodial care.  The

---

[11]   While the Court holds that Plaintiffs have alleged facts that establish that Defendants' aftercare transfers impinged Plaintiffs' constitutionally-protected liberty interests in safe conditions of confinement and minimally adequate food, shelter, and medical care, the Court expresses no opinion on whether Defendants nonetheless are entitled to qualified immunity because these liberty interests were not clearly established at the time of the aftercare placements.  Defendants have not moved for dismissal of Plaintiffs' procedural due process claim on this ground.  Nor have they presented any argument or authority as required by the Court's local rules.  *See* D.N.M.LR-Civ. 7.3.  Thus, the Court does not consider whether Defendants are entitled to dismissal of Plaintiffs' claim on the ground that the law was clearly established.

Court rejects this contention.[12]   As explained above, a state statute does not and cannot define the scope of constitutional rights, and thus whether Defendants' discharges of Plaintiffs were legal and effective under state law is irrelevant to the question whether Plaintiffs have alleged a viable Fourteenth Amendment claim.   *See supra* § I.A.2.a.   Rather, it is federal law that governs Plaintiffs' Fourteenth Amendment rights, *see Loudermill*, 470 U.S. at 541, and, under federal law, the Court concludes that Defendants terminated their *legal* custody over Plaintiffs when they discharged Plaintiffs from the Training School.[13]

Nonetheless, as explained above, after their discharges from the Training School, Defendants immediately assumed *physical* custody over Plaintiffs a second time, by retaining physical control over Plaintiffs post-discharge, transporting them across the state, and placing them in third-party settings.   Although the Court has rejected the argument of continuous custody and has held that *legal* custody terminated upon Plaintiffs' discharges, it is unclear whether Plaintiffs assert in the alternative that Defendants retained *physical* custody over Plaintiffs and that, during this second custodial period (of physical custody), Defendants deprived Plaintiffs of protected liberty interests by placing Plaintiffs in third-party settings (with the exception of RH) where Plaintiffs suffered from infringements on their personal security and their rights to minimally adequate food, shelter, and medical care.   Construing the complaint in the light most favorable to Plaintiffs, the Court will assume that Plaintiffs assert this claim.[14]

---

[12]   Because the Court rejects the contention in this context, the Court declines to consider it in the other contexts in which Plaintiffs' maintain that the state still retains custody over Plaintiffs.

[13]   Plaintiffs allege that ENMRSH is a state actor.   That Plaintiffs may have from the point of placement at ENMRSH been in the custody of a state actor does not alter the fact that they were not in the custody of Defendants.

[14] It is puzzling that Plaintiffs would challenge the alleged deprivations of such profound liberty interests in safety and minimally adequate food, shelter, and medical care by way of a procedural

As explained above, while the general rule is that a state has no affirmative obligation to provide substantive services to its citizens, there is an exception for persons involuntarily committed to state custody:   in that case, the Constitution imposes upon the state a duty to assume responsibility for the committed person's safety and general well-being.   *See supra* § I.A.1.   The relevant question thus is whether, given its re-assumption of physical custody over Plaintiffs after discharging Plaintiffs and severing legal custody, Defendants' duty to protect Plaintiffs' safety and well-being extended to protecting Plaintiffs from harm while they were in third-party placements.

The Supreme Court explained in *DeShaney* that the due process clause of the Fourteenth Amendment serves as a limitation on state power and not as a guarantee of certain minimal levels of care and protection, only forbids the state itself from engaging in its own affirmative conduct that deprives an individual of life, liberty, or property without due process of law, and confers no affirmative right to governmental aid outside of involuntary commitment, even if such aid may be necessary to protect life, liberty, or property interests that the government itself could not directly deprive.   *See DeShaney*, 489 U.S. at 195-96.   The *DeShaney* Court further recognized that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion *by private actors*."   *Id.* at 195 (emphasis added).   Stated differently, the purpose of the Due Process Clause is "to protect the people from the State, not to ensure that the State protected them from each other."   *Id.* at 196.   "If the Due

---

due process claim against Defendants, where Plaintiffs' only remedies are additional *procedures* prior to the infringement, rather than the provision of the *substantive rights* of protection and care. *Cf. Gonzales v. City of Castle Rock*, 366 F.3d 1093, 1119 (10th Cir. 2004) (exclaiming it "improbable" that the plaintiff would invoke a procedural due process "property interest in the enforcement of her protective order, which she argues could not be deprived without an opportunity to be heard," because it would mean that the plaintiff "sought only a hearing on the decision not to enforce the protective order—rather than enforcement itself," which could only be obtained through a substantive due process claim), *rev'd on other grounds*, 545 U.S. 748 (2005).

Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them."   *Id.* at 196-97.

Under these governing principles, the relevant question for this Court is whether Plaintiffs have alleged facts indicating that Defendants, not ENMRSH, through Defendants' own affirmative conduct, impinged Plaintiffs' interests in freedom from intrusions on their personal security and in minimally adequate food, shelter, and medical care, or whether, as Defendants contend, the complaint alleges only that *ENMRSH* intruded on these liberty interests and that the state failed to prevent the intrusion.   The Court holds that the complaint fails to allege that Defendants engaged in affirmative conduct that deprived Plaintiffs of their liberty interests in safety and minimally adequate food, shelter, and medical care.

As a threshold matter, the Court holds that the second custodial period—*i.e.*, of physical but not legal custody—ended when Defendants relinquished their physical control over Plaintiffs by leaving Plaintiffs at ENMRSH or at another third-party setting.   The allegations therefore must establish that Defendants' own affirmative conduct impinged Plaintiffs' liberty interests during this period.

The complaint alleges that, at ENMRSH, Plaintiffs suffered various forms of abuse, neglect, and economic exploitation, including living in unsafe homes, being physically and medically neglected, and having their critical medical needs ignored, and that ENMRSH failed to ensure that Plaintiffs had adequate food, safe and sanitary housing, and minimally adequate medical services.   The complaint further alleges that Defendants failed to protect Plaintiffs from ENMRSH's abuse and neglect over the 30-year period that Plaintiffs were placed at ENMRSH, and that Defendants abandoned Plaintiffs with no protections against abuse.   According to the

complaint, Defendants "permitt[ed]" ENMRSH "to deprive Plaintiffs of . . . safe[] and sanitary housing, adequate safety, [and] medical, dental and psychological care;" Plaintiffs would have received the protection and services that they needed if Defendants had placed Plaintiffs with "a professionally managed provider agency," [Doc. 102 ¶ 97]; Plaintiffs would have received "a vast array of services and legal protections" if they had continued to reside at the Training School; Plaintiffs did not receive these services because Defendants discharged them, [*id.* ¶ 98]; and Defendants "were aware of the likelihood of abuse . . . as a result of their dumping of residents without due process or judicial or Training School oversight," [*id.* ¶ 96].

These claims, at best, amount to nothing more than the claims advanced and rejected in *DeShaney*:   that the state failed to provide protection and care to the plaintiffs, which, if provided, would have protected the plaintiffs from a third-party's deprivations.   Pursuant to *DeShaney* and other Supreme Court precedent cited therein, the failure to prevent harm and the failure to provide substantive services to those *not committed to* state custody do not constitute affirmative conduct by the state sufficient to implicate the due process clause's protections.   Thus, Defendants' failure to prevent ENMRSH from depriving Plaintiffs of their liberties does not state a constitutional claim.

Likewise, the allegations that Plaintiffs would have received "a vast array of services and legal protections" if they had continued to reside at the Training School and that Plaintiffs did not receive these services because Defendants discharged them, [*id.* ¶ 98], amount to nothing more than a claim that Defendants were obligated to retain custody over Plaintiffs and to provide the benefits of protection and care that accompany involuntary commitment.   The Court already has considered and rejected this argument in the context of holding that Plaintiffs have failed to establish that their *discharges* from the Training School implicated a protected liberty interest.

*See supra* § I.A.1.  Thus, Defendants' failure to place Plaintiffs in an appropriately-managed, third-party setting or to provide Plaintiffs directly with services, both of which would have taken the place of Plaintiffs' post-discharge transfers to ENMRSH and enabled Plaintiffs to avoid suffering the harms that flowed from those placements, does not state a constitutional claim.  *Cf. DeShaney*, 489 U.S. at 196-97 (recognizing if the state is not required to provide substantive services, it cannot be held liable for injuries that could have been avoided if it had chosen to provide substantive services).

Finally, that the complaint alleges knowledge on the part of Defendants does not rise to the level of affirmative conduct necessary to trigger Fourteenth Amendment protection.  *DeShaney* confirmed that an affirmative duty to protect arises only "from the limitation which [the state] has imposed on [an individual's] freedom to act on his own behalf" and not from the state's "knowledge of the individual's predicament."  *Id.* at 200 (citation omitted).

Missing from the complaint are any allegations establishing that Defendants, through their own "affirmative conduct," deprived Plaintiffs of their liberty interests in personal security and minimally adequate food, shelter, and medical care.  While the complaint alleges that it was Defendants who made the affirmative decision permanently to remove Plaintiffs JL, EH, DA, KC, and GS from the Training School and place them at ENMRSH (or, in the case of GS, place him at this mother's home where he then received day services from ENMRSH), it does not contain any allegations of affirmative conduct on the part of Defendants in conjunction with their transfers of Plaintiffs post-discharge from the Training School that deprived Plaintiffs of their liberty interests in personal security and minimally adequate food, shelter, and medical care.  Because the Supreme Court has held that deprivations indirectly attributable to state defendants do not amount to the *deprivation* of a protected interest within the meaning of the Fourteenth Amendment, the

Court concludes that Plaintiffs have failed to satisfy their qualified immunity burden of alleging the necessary facts to state a constitutional claim.[15]

       3.     <u>Plaintiffs have Sufficiently Alleged that the Post-Discharge (but not Aftercare) Transfers to ENMRSH Deprived Plaintiffs of a Clearly Established Protected Property Interest in Government Payments</u>.

Defendants argue that Plaintiffs have failed to allege facts that state a procedural due process claim to the extent that those claims are premised upon the theory that, by transferring Plaintiffs (with the exception of RH) to ENMRSH, Defendants deprived Plaintiffs of a protected property interest in receiving benefits from the Social Security Administration ("SSI benefits"), Medicaid and Medicare payments, and Developmental Disabilities Waiver services.   According to Defendants, Plaintiffs fail to allege any facts to show that Defendants actually *deprived* Plaintiffs of these payments or benefits.

Defendants correctly note that the complaint does not contain allegations establishing that Defendants' *discharges* of Plaintiffs from the Training School deprived Plaintiffs of their right to government payments.   The complaint, however, does contain allegations establishing that Defendants' *transfers* of Plaintiffs to ENMRSH deprived Plaintiffs of their right to payments. Plaintiffs allege that, in conjunction with transferring Plaintiffs to ENMRSH, Defendants also

---

[15]   The Court's holding is equally applicable to Plaintiffs' claim that Defendants' post-discharge transfers of Plaintiffs to ENMRSH deprived Plaintiffs of their alleged liberty interest in receiving habilitation services.   The Court in Section I.C., *infra*, grants qualified immunity to Defendants on the ground that the law establishing that those in state custody have a liberty interest in receiving habilitation services was not clearly established at the time of the challenged conduct. Defendants, however, also argue that Plaintiffs have failed to allege facts establishing that Defendants' post-discharge transfers of Plaintiffs to ENMRSH deprived Plaintiffs of their protected interest in receiving habilitation services.   The same reasoning that supports the Court's decision that Plaintiffs have failed to allege that Defendants' post-discharge placements of Plaintiffs at ENMRSH violated Plaintiffs' protected liberty interests in personal security and minimally adequate food, shelter, and medical care, also supports the conclusion that Defendants' post-discharge placements of Plaintiffs at ENMRSH did not deprive Plaintiffs of a protected liberty interest in receiving habilitation services.

"facilitated the transfer of JL's, EH's, DA's, KC's, and GS's social security checks to ENMRSH Defendants without having ENMRSH Defendants appointed as Plaintiffs' conservator, and with deliberate indifference to whether ENMRSH Defendants were using or intended to use these social security funds for the benefit of Plaintiffs."   [Doc. 102 ¶ 93].   Plaintiffs allege that Defendants "permitt[ed] their agents, the ENMRSH Defendants[,] to deprive Plaintiffs of . . . Medicaid benefits[ and] social security benefits," [*id.* ¶ 97], and "were aware that . . . ENMRSH . . . intended to keep Plaintiffs' federal benefits[] and approved the arrangement," [*id.* ¶ 101].   Plaintiffs allege that ENMRSH operated as the representative payee for the benefits and, instead of utilizing the payments for Plaintiffs' benefits, used the funds to benefit themselves and ENRMSH employees. [*Id.* ¶ 119; *see also id.* ¶ 100].   These allegations establish that Defendants deprived Plaintiffs of their SSI benefits and Medicaid payments.

Defendants also argue that Plaintiffs have failed to allege facts establishing that they had a legitimate claim of entitlement grounded in state law giving rise to a protected property interest. Defendants assert that "Plaintiffs have failed to show, through allegations or citations to law, that even if such benefits were terminated . . . that they had a legitimate entitlement to such benefits." [Doc. 285 at 15].   The Court already has held that Plaintiffs' factual allegations are sufficient to establish that Defendants deprived Plaintiffs of SSI and Medicaid benefits.   The Court now also holds that Plaintiffs have alleged facts establishing that they had a Fourteenth Amendment protected property interest in their SSI benefits and Medicaid payments.   That the complaint does not allege the specific state or federal law creating the interest is not of consequence, because it meets the pleading standard set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Moreover, while Plaintiffs have pointed to no specific provision of a state or federal law granting them a property right, the Supreme Court has specifically held that the right to continued receipt of

Social Security disability benefits is a constitutionally-protected property interest.  *See Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) (holding that, "as has been implicit in our prior decisions . . . the interest of an individual in continued receipt of [Social Security disability benefits] is a statutorily created 'property' interest protected by the Fifth Amendment") (citations omitted). The Court similarly concludes that, to the extent that the law granted Plaintiffs Medicaid benefits, the law conferred upon Plaintiffs a constitutionally property right.  For these reasons, the Court holds that Plaintiffs have alleged a property right protected by the Fourteenth Amendment.

C.    The Liberty Interests of Receipt of Habilitation Services, Placement in the Least Restrictive Setting, and the Opportunity to Associate with Family and Peers were Not Clearly Established.

Defendants argue that even if their transfers of Plaintiffs to ENMRSH or other third-party settings, either post-discharge or through the aftercare program, deprived Plaintiffs of protected liberty interests in receipt of habilitation services, placement in the least restrictive setting, and the opportunity to associate with family and peers, Defendants nonetheless are entitled to dismissal on the ground of qualified immunity because Plaintiffs have failed to establish that these liberty interests were clearly established at the time of the transfers in question.  The Court agrees. Under the law in effect at the time of the challenged conduct, a reasonable official in Defendants' position would not have known that the transfers implicated Plaintiffs' protected liberty interests.

1.    A Liberty Interest in Receipt of Habilitation Services was Not Clearly Established.

Defendants assert that they are shielded by qualified immunity from Plaintiffs' claims premised upon the deprivation of their liberty interest in receiving habilitation services while in state custody because the right to minimally adequate habilitation was not clearly established until 1982 when the Supreme Court decided *Youngberg v. Romeo*, 457 U.S. 307(1982).   Defendants

reason that because Plaintiffs' third-party placements and discharges from the Training occurred prior to 1982, Plaintiffs have failed to show that a reasonable official in Defendants' position would have been on notice that the conduct violated Plaintiffs' rights.

In *Youngberg*, the Supreme Court considered for the first time the substantive Fourteenth Amendment rights of "involuntarily committed mentally retarded persons."   *Id.* at 314.   The Court acknowledged that the state has a duty to protect and provide minimally adequate food, shelter, and medical care for those involuntarily committed to its custody, *id.* at 317, but explained that it was faced with the "more troubling" question whether there is a liberty interest "to minimally adequate habilitation," *id.* at 316.   The Court ultimately held that institutionalized persons possess a right to minimally adequate habilitation, but held that that right exists only to the extent that habilitation is required to ensure safe conditions of confinement and freedom from bodily restraint.   *See id.* at 319.   The Court noted that the dispute before it did not "present the difficult question of whether a mentally retarded person, involuntarily committed to a state institution, has some general constitutional right to training *per se*."   *Id.* at 318.

Although Plaintiffs argue that the right to habilitation services was clearly established at the time of the challenged conduct, the Court is not persuaded.   It was not until 1982, when the Supreme Court decided *Youngberg*, that the right to habilitation training to ensure freedom from restraint and safe conditions of confinement became clearly established.   *See Phillips v. Thompson*, 715 F.2d 365, 368, (7th Cir. 1983) (explaining that "*Youngberg* teaches that, at the most, the class members were entitled to minimally adequate training as is reasonable in the light of their interest in freedom of movement").   Moreover, at the time of the *Youngberg* decision, it was still not decided, and therefore not clearly established, that an involuntarily committed person has a general right to habilitation or training per se.

According to Plaintiffs, while the Supreme Court did not recognize a right to training and habilitation to ensure safety and freedom from undue restraint until 1982, the weight of authority from other courts clearly established the right to habilitation services.   In support of this argument, Plaintiffs cite a 1977 decision from the Eighth Circuit holding that "[b]y early 1974 the course of relevant decisions was clearly trending toward the view that the noncriminal . . . retarded who are confined in state institutions have a constitutional right to reasonable treatment for their . . . conditions."   *Welsch v. Litkins*, 550 F.2d 1122, 1126 n.6 (8th Cir. 1977).   Plaintiffs also cite a 1972 district court decision holding that by 1972 it was "clear beyond cavil" that "civilly committ[ed] . . . mental[ly] retard[ed persons] . . . [are] possessed of an inviolable constitutional right to habilitation."   *Wyatt v. Stickney*, 344 F. Supp. 387, 390 (M.D. Ala. 1972), *aff'd in part and rev'd in part*, 503 F.2d 1305 (5th Cir. 1974).

Plaintiff's citation to these two cases is insufficient to demonstrate that the weight of authority rendered the right clearly established.   Further, the Supreme Court's decision in *Youngberg* indicates that as of 1982, it was still a "troubling" question.   457 U.S. at 316.   Thus, Plaintiffs have not met their qualified immunity burden of showing that a reasonable official in Defendants' position would have been on notice that his or her actions of transferring Plaintiffs to third-party settings without habilitation services violated Plaintiffs' rights.   Defendants, therefore, are entitled to qualified immunity from Plaintiffs' procedural due process claims to the extent that those claims are premised upon the deprivation of habilitation and training services.

2.   <u>A Liberty Interest in Placement in the Least Restrictive Setting was not Clearly Established</u>.

Defendants assert that it was not clearly established that Plaintiffs possessed a protected liberty interest to placement in the least restrictive setting.   In support of their argument,

46

Defendants cite *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239, 1248 (2d Cir. 1984), in which the Second Circuit stated that post-*Youngberg* courts have held that there is no constitutional right to a "'least restrictive environment.'"   *Id.* (citations omitted).   In response to Defendants' motion, Plaintiffs do not identify, and this Court finds, no Tenth Circuit or Supreme Court case recognizing such a right at the time of the challenged conduct in question. Plaintiffs, in fact, fail to advance any argument in their opposition to summary judgment regarding their procedural due process claims premised upon placement in the least restrictive setting.   For these reasons, the Court concludes that Plaintiffs have not satisfied their qualified immunity burden of alleging the violation of a clearly established right to placement in the least restrictive setting, and therefore grants Defendants' motion to dismiss this claim.

3.    <u>A Liberty Interest in the Opportunity to Associate with Family or Peers was not Clearly Established</u>.

Defendants argue that it was not clearly established that Plaintiffs possessed a protected liberty interest to family relationships on the date of Plaintiffs' discharges and post-discharge transfers from Los Lunas to Clovis, New Mexico, *i.e.*, March 23, 1979.   In their opposition to the Motion to Dismiss First Amendment Claim, Plaintiffs request that, in the event that the Court dismisses their First Amendment familial association claim, the Court construe their right of familial association claim as a Fourteenth Amendment procedural due process claim as well. [Doc. 247 at 17].   As discussed below, the Court grants Defendants' Motion to Dismiss First Amendment Claim, and thus, consistent with Plaintiffs' request, the Court examines whether Plaintiffs have alleged facts that implicate a clearly established protected liberty interest within the meaning of the Fourteenth Amendment.

In *Roberts v. United States Jaycees*, the Supreme Court distinguished the liberty interest in freedom of intimate association, which the Court determined is protected by the Fourteenth Amendment, from the liberty interest in freedom of expressive association, which the Court determined is protected by the First Amendment.   104 S. Ct. 3244, 3249 (1984); *see Trujillo v. Board of Cty. Comm'rs of the Cty. of Santa Fe*, 768 F.2d 1186, 1188 (10th Cir. 1985) (noting that the Supreme Court in *Jaycees* "anchored the freedom of expressive association in the First Amendment," and "identified the freedom of intimate association as 'an intrinsic element of personal liberty'") (quoting *Roberts*, 104 S. Ct. at 3252).   Regarding the freedom of intimate association, the Court explained that "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State."   *Roberts*, 104 S. Ct. at 3252. Included in this category, the Court indicated, are family relationships, which "by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctly personal aspects of one's life."   *Id.* at 3250.

In 1985, in *Trujillo*, the Tenth Circuit, in deciding whether a mother and daughter had a constitutionally-protected interest in their relationships with their son and brother, noted that the Supreme Court "clarified the constitutional sources of associational freedoms" the previous year in the *Roberts* decision.   768 F.2d at 1188.   After recognizing that *Roberts* confirmed that certain choices to enter into and maintain "'intimate human relationships'" must be secured against undue intrusion by the state, and identifying the types of relationships included in that category, the *Trujillo* court noted that the Supreme Court and other Circuit Courts of Appeal "have recognized liberty interests in familial relationships other than strictly parental ones."   *Id.* (citing *Moore v. City of East Cleveland*, 431 U.S. 494 (1977) (holding that a zoning ordinance could not prohibit a

grandmother from living with her grandsons who were cousins); *Smith v. Org. of Foster Families For Equality & Reform*, 431 U.S. 816 (1977) (holding that foster parents have a liberty interest in their relationship with their foster children); *Wilson v. Taylor*, 733 F.2d 1539 (11th Cir. 1984) (holding that interference with a dating relationship was actionable); *Rivera v. Marcus*, 696 F.2d 1016, 1024-25 (2d Cir. 1982) (holding that a half-sister who also was a foster mother had a protected interest in siblings); *Drollinger v. Milligan*, 552 F.2d 1220, 1226-27 (7th Cir. 1977) (holding that deprivation of a grandfather's relationship with his grandchild was actionable)). The *Trujillo* court also cited *Bell v. City of Milwaukee*, 746 F.2d 1205, 1244-47 (7th Cir. 1984), in which the Seventh Circuit declined to find a protected interest between siblings.  *Id.* at 1189. The *Trujillo* court acknowledged that the "parental relationship may warrant the greatest degree of protection and require the state to demonstrate a more compelling interest to justify an intrusion on that relationship," but held that it could not agree with the Seventh Circuit's decision in *Bell* "that other intimate relationships are unprotected and consequently excluded from the remedy established by section 1983."  *Id.*   Thus, the *Trujillo* court held that not only the mother but also the sister had a constitutionally-protected interest in relationships with their son and brother.  *Id.*

Thereafter, in 1993, the Tenth Circuit confirmed in *Griffin v. Strong* that "[t]his court first recognized the right [of familial association] in *Trujillo v. Board of County Commissioners*." *Griffin*, 983 F.2d 1544, 1546 (10th Cir. 1993).   In *Griffin*, the court addressed the issue of whether a wife, whose husband was the subject of a child abuse investigation, had a constitutionally-protected right of familial association with her husband and whether, by falsely telling the wife that her husband had confessed to child abuse, a police officer interfered with that right.   The Tenth Circuit confirmed that the familial right of association "is properly based on the concept of liberty in the Fourteenth Amendment," and held that it is a subset of the substantive due

process right of freedom of intimate association.  *Id.* at 1547 (internal quotation marks and citations omitted).   The court further explained that the right of familial association is "consonant with the right of privacy."   *Id.* (citations omitted).   The *Griffin* court then noted that the right of intimate association is not absolute, *id.* at 1549, and that, "[i]n the classic fourteenth amendment liberty analysis, a determination that a party's constitutional rights have been violated requires 'a balancing [of] liberty interests against the relevant state interest,'" *id.* at 1547 (quoting *Youngberg*, 457 U.S. at 321).   The court ultimately held that, upon balancing the wife's interests against the state's interests, the police officer did not interfere with the wife's protected liberty interest in her familial relationship with her husband because the infringement on the wife's interest was "slight." *Id.* at 1549.

While the Tenth Circuit's decision in *Trujillo* recognizes that a mother and sister have a protected liberty interest in their family relationships with their son and brother, and *Griffin* recognizes that a wife has a protected interest in her familial relationship with her husband, as of 1989 and 2000, the Supreme Court had not yet decided whether a child has a protected liberty interest in his or her relationship with a parent.   In 1989, the Supreme Court, confronted with the claim of a child that she had a liberty interest in her familial relationship with her natural father, observed that it has "never had occasion to decide whether a child has a liberty interest, symmetrical with that of her parent, in maintaining her filial relationship."  *Michael H. v. Gerald D.*, 491 U.S. 110, 130 (1989).   The Court concluded, however, that it did not need to decide the question, because, even assuming that the child had such a right, she could not state a claim.  *Id.* Moreover, Justice Stevens' 2000 dissent in *Troxel v. Granville* recognized that, while a parent has a liberty interest in a familial relationship with his or her child, the "Court has not yet had occasion

to elucidate the nature of a child's liberty interests in preserving established familial or family-like bonds."   530 U.S. 57, 88 (2000) (Stevens, J., dissenting) (citing *Michael H.*, 491 U.S. at 130).

Thus, although the Tenth Circuit's decision in *Trujillo* recognized that, as of 1985, some Circuits had extended the right to familial association beyond the right of a parent—*e.g.*, to grandparents, foster parents, a half-sister who was also a foster mother, and a dating relationship, the Tenth Circuit had not even recognized a right to familial association *at all* before it decided *Trujillo*.  *See Griffin*, 983 F.2d at 1546.  Moreover, when the Tenth Circuit did recognize the right in *Trujillo*, that right was a mother's and a sister's right to associate with their son and brother, not a child's right to associate with his or her parent.  *Cf.* 768 F.2d at 1188 (citations omitted).  Thereafter, in its 1993 decision in *Griffin*, the Tenth Circuit held that the right to intimate association extended to a wife's right to associate with her husband.  *Cf.* 983 F.2d at 1546.  These decisions confirm that, as of March 23, 1979, it could not have been clearly established in the Tenth Circuit that Plaintiffs possessed a right to familial association with their parents or with any other family members.  Similarly, the Supreme Court's 1989 decision in *Michael H.* and Justice Stevens' 2000 dissent in *Troxel* confirm that, as of March 23, 1979, a child's liberty interest in familial association with a parent was not clearly established by Supreme Court law.  Indeed, Plaintiffs have identified no Supreme or Tenth Circuit cases decided prior to March 23, 1979, protecting a right to familial association in circumstances similar to those here.  Plaintiffs thus have failed to meet their burden of showing that the law was clearly established on the date of the challenged conduct.

The cases cited by Plaintiffs were decided after 1979, and either do not involve a Fourteenth Amendment liberty interest in familial association or hold that no such interest existed. For example, Plaintiffs rely upon *Walters v. Western State Hospital*, 864 F.2d 695 (10th Cir.

1988), for the proposition that the "right of an institutionalized person not to be isolated from intimate associates was clearly established by 1981 at the latest."   [Doc. 247 at 15].   Defendants contend, however, and the Court agrees, that *Walters* is inapposite and therefore could not have placed a reasonable official in Defendants' position on notice that the conduct in question violated JL's and KC's Fourteenth Amendment liberty interest in intimate, familial association.

*Walters*, in fact, did not involve a liberty interest in familial association, but rather involved the question whether the state impinged a patient's constitutionally-protected interests in privacy and in minimally adequate care, when the patient was confined to state protective custody, admitted to a mental institution, treated with psychotropic medication against his will, and prevented from communicating with persons outside the institution for seven to ten days.   *See Walters*, 864 F.2d at 696-97, 699-700.   The *Walters* court held that the plaintiff had a clearly established right to decide his own health, and that forcing him to take psychotropic drugs against his will violated his privacy right to decide whether to be helped or left alone.   *Id.* at 697.   The court further held that the plaintiff had a constitutionally-protected right to minimally adequate care, and that this right encompassed the right to communicate with persons outside the institution. *Id.* at 699.   The court concluded that the "constitutional right to communicate with persons outside the institution was clearly established at the time of his involuntary admission," *id.*, emphasizing that, "[i]ndeed, in April 1981, it was *so* clearly established that the constitutional right to minimally adequate care and treatment encompassed rights of visitation and communication with persons outside the institution that such provisions were routinely include in district court orders affecting institutionalized persons," *id.* at 700 (citations omitted).

In regards to this latter holding, the court cited several district court cases.   These cases, however, like *Walters*, do not involve the right to familial association, but rather implicate liberty

interests in minimally adequate care, including habilitation services, and in freedom from undue restraint.  *See Eckerhart v. Hensley*, 475 F. Supp. 908, 924-24 (W.D. Mo. 1979) (deciding on August 11, 1979—five months after JL's and KC's discharges—the separate issue whether unduly restrictive policies regarding visitation, telephone, and mail violated residents' liberty interest in minimally adequate care and treatment and not whether these limitations infringed the right to familial association); *Evans v. Washington*, 459 F. Supp. 483, 489 (D.D.C. 1978) (holding that "[t]he mentally retarded residents of Forest Haven who constitute the plaintiff class . . . have a federal constitutional right to habilitative care and treatment based upon the Due Process Clause of the Fifth Amendment," and that the defendants had violated these rights, but not considering whether the residents had a right to familial association); *Gary v. Louisiana*, 437 F. Supp. 1209, 1219, 1223-31 (E.D. La. 1976) (considering the adequacy of treatment programs in out-of-state institutions for developmentally-impaired and delinquent children in the context of deciding whether the treatments protected residents' constitutionally-protected right to minimally adequate care, treatment, and habilitation services, and not in the context of deciding whether the residents' Fourteenth Amendment right to familial association was infringed).[16]  Thus, neither *Walters*, nor any of the cases upon which it relied, concerned a Fourteenth Amendment right to familial association.

Similarly, Plaintiffs' citation to *Wise v. Bravo*, 666 F.2d 1328 (10th Cir. 1982), is unavailing.  Plaintiffs claim that in *Wise*, Judge Seymour, concurring, opined that the right of

---

[16]  Similarly, while the *Walters* court relied upon *Davis v. Watkins*, 384 F. Supp. 1196 (N.D. Ohio 1974), and *Wyatt v. Stickney*, 344 F. Supp. 373 (M.D. Ala. 1972), these decisions did not involve a protected Fourteenth Amendment liberty interest in familial association.  *See Davis*, 384 F. Supp. at 1207-08 (requiring reasonable visitation and use of telephones, among other things, to ensure that plaintiffs' liberty interests in minimally adequate care are not infringed); *Wyatt*, 344 F. Supp. at 379-80 (same).

familial association between a parent and child "is not created either by the Constitution or by state statute," but rather "is one of those fundamental, inherent rights of every individual that predates both the federal Constitution and the state laws.   Like the right to marry and have children and the right to live where one wants and pursue a livelihood by any lawful means, this right constitutes a 'liberty' interest.   As such, it is protected by the due process clause."   *Id.* at 1336 (Seymour, J., concurring).   Judge Seymour's concurring opinion in *Wise*, however, is not sufficient to place Defendants on notice that their conduct violated Plaintiffs' constitutional rights.   First, that concurrence was decided in 1981, over two years after the challenged conduct in question. Second, it is a *concurring* opinion; the majority opinion itself far from establishes that a child has a protected right in retaining a family relationship with his or her parent.

In *Wise*, a divorced husband brought a Section 1983 suit against the city, police department, and police officer for damages arising out of police inference with his child visitation rights.   *Id.* at 1330.   Although the divorce decree awarded the plaintiff's ex-wife custody with no ordered visitation for the plaintiff, the plaintiff and his ex-wife established an informal visitation schedule.   *Id.*   The plaintiff's ex-wife agreed to a period of extended visitation, but one week into the visitation period, she requested return of the child.   *Id.*   When the plaintiff refused, police arrived at the plaintiff's apartment, the plaintiff informed the defendant-officer that he was "not welcome" inside, and the officer nonetheless entered and removed the child from the apartment. *Id.*   The plaintiff argued that the officer's actions deprived him of his constitutionally-protected liberty interest in his relationship with his child.   *Id.* at 1331.

In rejecting the plaintiff's claim, the Tenth Circuit recognized that a "long line of federal court decisions involving challenges to state law governing a wide range of subject matter involving family relationships, including child custody," are "anchored to claimed deprivations of

54

Due Process," and acknowledged that "[t]hese federal decisions, to be sure, recognize the important, fundamental interest involved, deserving of close Due Process . . . scrutiny." *Id.* at 1331-32. The Court, however, held that "there is no substantive federal constitutional, statutory or common law governing family relationships, including matters of custody and visitation rights between parents and children. The substantive aspect of the subject of family law and domestic relations is one uniquely within the province of the respective states." *Id.* For this reason, the court concluded that the plaintiff "failed to demonstrate any substantial, identifiable federal constitutional[] deprivation under the Due Process," and that "[a]ny deprivation of [plaintiff's] visitation rights was [too] insubstantial in duration and effect to rise to a federal constitutional level." *Id.* at 1332-33. Judge Seymour's concurring opinion states that, "[i]f the majority's holding in this case rests on the premise that an interference with visitation rights under color of state law can never rise to the level of a constitutional deprivation, I must respectfully disagree." *Id.* at 1338. Judge Seymour took issue with the majority opinion's statement that "there is no substantive federal constitutional . . . law governing family relationships," for the Fourteenth Amendment "does 'govern' such rights in the sense that it is the ultimate 'protector' of them," *id.* at 1337; Judge Seymour noted that it is "confusing to say that '(t)he substantive aspect of the subject of family law and domestic relations is one uniquely within the province of the respective states,'" and that "[i]t is more accurate to say that the regulation of the subject is uniquely within the province of the states." *Id.*

*Wise* involves a parent's right to associate with his child, which, as the Supreme Court recognized in *Michael H.*, is not the equivalent of a child's right to associate with his or her parent. *See* 491 U.S. at 130. Moreover, the majority held that the plaintiff failed to allege any substantial, identifiable, federally protected right that stated a cognizable due process claim. *See Wise*, 666

F.2d at 1332-33.   Thus, contrary to Plaintiffs' contention, *Wise* did not place Defendants on notice that their conduct violated Plaintiffs JL and KC's constitutionally-protected liberty interest to associate with their family.

For the foregoing reasons, Plaintiffs have not shown that the law in effect at the time of Plaintiffs JL's and KC's discharges and post-discharge transfers was clearly established, and therefore Plaintiffs have not overcome Defendants' assertion of qualified immunity.   The Court therefore grants Defendants' motion to dismiss Plaintiffs' procedural due process claims premised upon the deprivation of a liberty interest in familial association.

D.   <u>Plaintiffs have Sufficiently Alleged that the Process Defendants Provided was Constitutionally Deficient and have Shown that Plaintiffs' Right to Additional Procedures was Clearly Established.</u>

Defendants next assert that, even if Plaintiffs have alleged the deprivation of protected liberty and property interests, Plaintiffs cannot state a constitutional due process claim because the process Defendants provided in conjunction with the alleged deprivations was constitutionally sufficient.   Even if the process was not sufficient, Defendants nonetheless claim that they are entitled to qualified immunity because Plaintiffs' right to additional procedures was not clearly established.

1.   <u>Plaintiffs Have Sufficiently Alleged that the Process Defendants Provided was Deficient.</u>

Once a plaintiff establishes both the existence and deprivation of a protected property or liberty interest, the court next must determine whether the challenged procedures are sufficient. Courts balance a number of factors to determine whether procedures comport with due process. A court first weighs the private interest that will be affected by the official action, next weighs "the risk of an erroneous deprivation of such interest through the procedures used, and the probable

value, if any, of additional or substitute procedural safeguards," and last weighs the "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."   *Parham v. J.R.*, 442 U.S. 584, 599-600 (1979) (citations omitted).   "[D]ue process is flexible and calls for such procedural protections as the particular situation demands."   *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Although generally some form of hearing or "right to be heard" is required before an individual can be deprived of a protected interest, *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citations omitted), due process does not always necessitate "a formal or quasi-formal, hearing," *Parham*, 442 U.S. at 608.

Defendants rely upon the 1979 case of *Parham*, in which the Supreme Court specifically addressed a child's liberty interests in not being confined unnecessarily in a state mental hospital for treatment, to support their claim that the procedures they provided to Plaintiffs were constitutionally sufficient.   *See id.* at 584.   The *Parham* Court weighed, on the one hand, the child's interest in not being committed, with, on the other hand, the government's interest in properly allocating its mental health facilities to cases of genuine need and its mental health professionals to caring for patients instead of complying with "time-consuming procedural minuets."   *Id.* at 606.   The Court concluded that due process required only that "some kind of inquiry should be made by a 'neutral factfinder,'" not necessarily someone with legal training or a judicial or administrative officer, "to determine whether the statutory requirements for admission [were] satisfied."   *Id.*   Specifically, the Court held that "a staff physician will suffice," that "[i]t is not necessary that the deciding physician conduct a formal or quasi-formal, hearing," and that "due process is not violated by the use of informal traditional medical investigative techniques."   *Id.* at 607-08.

It is abundantly clear that the procedures Defendants employed in conjunction with their discharges and transfers of Plaintiffs was deficient.   The process upon which Defendants rely is Plaintiffs' receipt of an inquiry by a neutral fact finder—*i.e.*, the SCAR committee—to determine whether Plaintiffs were in continued need of institutionalization.   Defendants point out that this committee conducted meetings, discussed Plaintiffs, and made the decisions to discharge them. Defendants further assert that Plaintiffs DA and GA were discharged by court order, and that they therefore received this process in addition to a decision by the SCAR committee.   Defendants note that, in the case of JL, Defendant Mateju sent written correspondence to the court indicating that JL had been discharged from the Training School.   Defendants contend that the foregoing process was constitutionally sound.

While the complaint alleges that while DA was discharged pursuant to an order, this discharge was *ex parte*, with no notice to DA or a surrogate, and was the result of an inaccurate and/or incomplete disclosure to the court of DA's condition or circumstances.   Moreover, the judicial paperwork to "discharge" DA did not provide the court with notice of Defendants' plan to transfer custody of Plaintiffs from the Training School to third parties, and it showed that no surrogate decision makers were informed of the "discharge" or transfer of custody to third parties.

Likewise, the complaint alleges that while Defendants effectuated judicial paperwork to "discharge" GS from the Training School, the paperwork similarly was *ex parte*, did not provide the court with notice of Defendants' plan to transfer custody of GS from the Training School to third parties, and showed that no surrogate decision makers were informed of the "discharge" or transfer of custody to third parties.   The complaint further alleges that Defendants did not provide GS or a surrogate with notice or any other due process protections, and that Defendants provided an inaccurate and/or incomplete assessment of GS's condition or circumstances to the court.

The Court holds that evaluation by a neutral fact finder in the absence of notice (not to mention meaningful notice), even if in conjunction with a court order obtained *ex parte* or in conjunction with an *ex parte* letter to a court, is as a matter of law constitutionally deficient.   The very "essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and an opportunity to meet it.'"   *Mathews*, 424 U.S. at 348-49 (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 171-72 (1951)).   On the facts alleged, Plaintiffs received no notice of the transfers or that, in the case of their final transfer, Defendants had discharged them from state custody, Plaintiffs' freedom of bodily movement had been restored, or Plaintiffs' post-discharge placements at ENMRSH were not compulsory.

To determine what procedures satisfy the Fourteenth Amendment, the Court must weigh the competing interests of Plaintiffs and the state.   *Cf. Parham*, 442 U.S. at 599-600.   Not surprisingly, Defendants have failed to identify, and this Court cannot conceive of, any legitimate government interest that might be impeded, or fiscal or administrative burden that could be incurred, by providing Plaintiffs with notice.   On the other hand, the liberty interest in freedom from bodily restraint is one of the core and fundamental interests protected by the Fourteenth Amendment.

It is painfully obvious to this Court that the failure to provide Plaintiffs with any notice whatsoever (not to mention meaningful notice to a substitute decision maker with capacity to act on Plaintiffs' behalf) of their transfers, particularly notice that their post-discharge placements at ENMRSH were not compulsory because they had been discharged from state custody, poses not only an extremely high risk, but rather an almost certain risk, of the erroneous deprivation of the liberty interest in freedom from bodily restraint.   Likewise, it is clear to the Court that the failure to provide Plaintiffs with any notice that Defendants would be depriving Plaintiffs of their

59

property interests in continued receipt of benefits under the 1953 Development Disabilities Code, as well as their property rights in receiving SSI and Medicaid payments, or depriving Plaintiffs of their liberty interests in safe conditions of confinement and minimally adequate food, shelter, and medical care, poses an extremely high risk of an erroneous deprivation of Plaintiffs' rights, particularly in light of Plaintiffs' developmental disabilities.   The Court further concludes not only that notice would have provided "probable value" to Plaintiffs in preventing these erroneous deprivations, but also that meaningful notice (to a substitute decision maker with capacity) would have provided certain value to Plaintiffs.   Thus, weighing Plaintiffs' interests against the state's interests and the burdens imposed on the state, the Court holds that the procedures provided by Defendants necessarily were flawed because they failed to include notice to Plaintiffs.

In the context of ruling upon Defendants' motion to dismiss, the Court need not decide whether, as Defendants assert, the informal process sanctioned by the Supreme Court in *Parham* suffices or whether, as Plaintiffs argue, a more formal or quasi-formal hearing was required prior to transferring and/or discharging Plaintiffs.   Nor need the Court determine whether, as Plaintiffs argue, they were entitled to notice and informed consent that was *meaningful—i.e.*, notice to substitute decision makers with capacity to consent on Plaintiffs' behalf—or whether they were entitled to representation or a right to be heard in court.   What is pivotal, and what ends this Court's inquiry, is that Defendants did not provide Plaintiffs with any notice whatsoever that they were placing Plaintiffs on aftercare, discharging Plaintiffs from involuntary commitment, and transferring Plaintiffs post-discharge to ENMRSH; that Plaintiffs were free from state restraint; or that Plaintiffs' post-discharge placement was voluntary.   That Defendants made these wholly unilateral decisions through a neutral evaluation board and screening committee at the Training School, or obtained *ex parte* orders from a court, is of little consequence; in the absence of any

notice to Plaintiffs of Defendants' decisions, the process was not meaningful or fair.   Thus, the lack of notice taints any process provided by a neutral decision maker such as the SCAR committee.

Because the Court concludes that due process required, at a minimum, some form of notice, and because the complaint alleges that Defendants failed to provide Plaintiffs with any notice, the complaint sufficiently alleges that the process Defendants provided was constitutionally deficient.   Therefore, the Court rejects Defendants' contention that Plaintiffs have failed to satisfy their qualified immunity burden of alleging facts that state a deprivation of a protected interest without due process of law.[17]

> 2.   Plaintiffs have Shown that the Right to Additional Procedures was Clearly Established.

Defendants argue that even if the process was deficient, they nonetheless are entitled to qualified immunity from Plaintiffs' procedural due process claims because the law identifying the due process required in conjunction with the deprivations was not clearly established at the time that they placed Plaintiffs on aftercare, discharged Plaintiffs from the Training School, and transferred Plaintiffs post-discharge to ENMRSH or another third-party setting.   The Court is not

---

[17]   Although the Court need not determine what process was due as a result of Defendants' deprivation of Plaintiffs' liberty interest in freedom from bodily restraint, which was impinged when Defendants post-discharge transferred Plaintiffs across the state and placed them in a third-party setting, the Court notes that, in *Heryford v. Parker*, 396 F.2d 393, 396 (10th Cir. 1968), the Tenth Circuit held that "where, as in . . . proceedings [concerning] . . . mentally deficient persons, the state undertakes to act in parens patriae, it has the inescapable duty to vouchsafe due process." *Id.*   In *Heryford*, due process required "that the infirm person, or one acting in his behalf, be fully advised of his rights, and accorded each of them unless knowingly and understandingly waived," and, for civil commitment proceedings, imposed on the state "the duty to see that a subject of an involuntary commitment proceedings is afforded the opportunity to the guiding hand of legal counsel at every step of the proceeding." *Id.*   Because Defendants provided Plaintiffs with no notice whatsoever, and this necessarily was constitutionally deficient, the Court need not determine to what extent the facts here require similarly stringent due process protections.

persuaded.   At the time of the challenged conduct, it was well and clearly established that the "essence of due process" required notice.   *See Mathews*, 424 U.S. at 348.   Indeed, a long line of Supreme Court precedent would have placed any reasonable official in Defendants' position on notice that due process requires *at a minimum* notice of the deprivation.   Thus, the Court holds that Plaintiffs have overcome Defendants' assertion of qualified immunity by alleging facts that state a deprivation of their constitutionally-protected interests, and by showing that Plaintiffs' protected interests, as well as the process required in conjunction with the deprivation of those interests, was clearly established at the time of the challenged conduct.

II.      Motion to Dismiss Court Access Claims [Doc. 275].

Plaintiffs assert claims against Defendants pursuant to 42 U.S.C. Section 1983 for violation of Plaintiffs' First and Fourteenth Amendment rights of access to courts, arguing that Defendants' failure to, among other things, provide notice to Plaintiffs, pursue fundamentally fair judicial process (*i.e.*, not an *ex parte* process), and provide Plaintiffs with the assistance of guardians or attorneys prior to discharging Plaintiffs from the Training School and transferring them to third-party settings, frustrated Plaintiffs' right of access to courts.   Defendants maintain that they are shielded by qualified immunity from these claims because Plaintiffs fail either to allege facts that establish actual injury or to show that the right of court access was clearly established.

To state a constitutional claim for infringement of the right to court access, a plaintiff must demonstrate that his or her capability of bringing a contemplated claim before the courts has been frustrated either because the claim has been lost or rejected or because its presentation is currently being prevented.   The Supreme Court in *Christopher v. Harbury*, 536 U.S. 403 (2002), explained that two categories of right to access claims have emerged:   forward-looking claims and backward-looking claims.   *Id.* at 413.   A backward-looking claim turns on litigating "an

62

opportunity already lost," while a forward-looking claim turns on the frustration of a future litigation opportunity.  *Id.* at 415.   The *Harbury* Court noted that while several Circuit Courts of Appeal have recognized the viability of backward-looking claims, none of the Supreme Court's cases have recognized this type of claim.  *See id.* at 414 n.9.   For purposes of its decision, the Court assumed that such a claim existed but nonetheless held that the plaintiff had failed to state a claim.  *Id.*

The *Harbury* Court explained that all of its (forward-looking) court access cases rest on the recognition that "the right [of access to courts] is ancillary to the underlying claim," and without the underlying claim, "a plaintiff cannot have suffered injury by being shut out of court."  *Id.* at 415.   The Court explained, for example, that in its decision in *Lewis v. Casey*, 518 U.S. 343 (1996), the Court had noted that even in forward-looking prisoner cases involving actions to remove roadblocks to future litigation, the plaintiff must identify a "'nonfrivolous,'" "'arguable,'" underlying claim.  *Harbury*, 536 U.S. at 415 (quoting *Lewis*, 518 U.S. at 353).   The Court concluded, however, that "[w]hether an access claim turns on a litigating opportunity yet to be gained or an opportunity already lost, the very point of recognizing any access claim is to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong." *Id.* at 414-15.   Thus, regardless of whether the right to access claim is forward- or backward-looking, the Court held that "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation."  *Id.* at 415.

Plaintiffs allege a backward-looking right of court access claim.[18]   The Supreme Court explained that "backward-looking cases are brought to get relief unobtainable in other suits."   *Id.* at 416.   "The ultimate object of [a backward-looking claim] is not the judgment in a further lawsuit, but simply the judgment in the access claim itself, in providing relief obtainable in no other suit in the future."   *Id.* at 414.   The Court thus held that a plaintiff in a backward-looking case must allege the specific remedy the plaintiff seeks for the purpose of "hedg[ing] against the risk that an access claim be tried all the way through, only to find that the court can award no remedy that the plaintiff could not have been awarded on a presently existing claim."   *Id*. at 416. Moreover, the Court held that, "when the access claim (like this one) looks backward, the complaint must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought."   *Id.*   The Court reasoned that "[t]here is, after all, no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element." *Id*.

The *Harbury* Court held that the plaintiff had failed to state such a claim because the plaintiff "could not satisfy the requirement that a backward-looking denial-of-access claim provide a remedy that could not be obtained on an existing claim."   *Id.* at 420-21.   In *Harbury*,

---

[18]   The complaint alleges facts establishing that Defendants failed to obtain informed consent for Plaintiffs' third-party placements and failed to terminate Plaintiffs' commitments either by filing a motion, or where they did file paperwork, filing paperwork with notice to Plaintiffs (*i.e.*, not *ex parte*).   Plaintiffs assert that had Defendants sought discharge through the courts and provided Plaintiffs with notice of the judicial actions, Plaintiffs would have had the opportunity of court access to challenge their discharges from the Training School as well as their post-discharge transportation across the state and placements in third-party settings.   Plaintiffs also allege that Defendants failed to provide them with the assistance of guardians and attorneys and that this impeded their ability to initiate court action.   Defendants assert, and the Court agrees, that these allegations implicate a backward-looking claim.

the wife of a murdered Guatemalan citizen brought a *Bivens* action alleging that federal officials'

concealment of information that her husband, a foreign dissident, was being detained and tortured

in his own country by military officers of his government, who were paid by the United States'

Central Intelligence Agency, resulted in denial of her right of access to courts.   *Id.* at 405.   The

respondent-wife theorized that federal officials denied her access to courts by leaving her without

information, or reason to seek information, with which she could have brought a lawsuit that might

have saved her husband's life.   *Id.*   The *Harbury* Court ultimately held that the respondent failed

to state an actionable claim because she "fail[ed] to seek any relief presently available for denial of

access to courts that would be unavailable otherwise."   *Id.* at 406.

In so holding, the Supreme Court acknowledged that "[i]t is true that [the petitioner] cannot

obtain in any present tort action the order she would have sought before her husband's death," *i.e.*,

the order that the respondent alleged might have saved her husband's life.   *Id.* at 421.   The Court

nonetheless reasoned, however, that "neither can she obtain any such order on her access claim,

which therefore cannot recompense [the petitioner] for the unique loss she claims as a

consequence of her inability to bring an intentional-infliction action earlier."   *Id.* at 421-22.   The

Court noted that the respondent "has not explained, and it is not otherwise apparent, that she can

get any relief on the access claim that she cannot obtain on her other tort claims, *i.e.*, those that

remain pending in the District Court" along with her access claim.   *Id.* at 422.   The Court held

that "it is just because the access claim cannot address any injury [the respondent] has suffered in a

way the presently surviving intentional-infliction claims cannot that [the respondent] is not

entitled to maintain the access claim as a substitute."   *Id*.

Similarly, in *Jennings v. City of Stillwater*, the Tenth Circuit applied *Harbury*'s holding

that an element of any backward-looking claim is for the complaint to "'identify a remedy that may

be awarded as recompense but not otherwise available in some suit that may yet be brought,'" and held that the absence of this element necessarily required dismissal of the *Jennings* plaintiff's claim.   383 F.3d 1199, 1209 (10th Cir. 2004) (quoting *Harbury*, 536 U.S. at 415).   In *Jennings*, the plaintiff-student brought a Section 1983 right of access to courts claim alleging that police officers violated her rights by failing to adequately investigate her alleged rape by members of the state university's football team and by destroying evidence.   *See id.* at 1200.   The Tenth Circuit explained that the plaintiff's court access claim failed because "[t]he only remedy that could conceivably be awarded to Plaintiff as a result of the alleged police misconduct would be damages for the loss of her civil tort claim against the assailants," and this is "precisely the same element of damage she sought and obtained in her suit against the four football players and [the university]." *Id.* at 1209.   The Circuit noted that, "[f]ar from being barred from bringing such an action, Plaintiff pursued her claims and reached a monetary settlement," and therefore "had access to the courts, and obtained a remedy."   *Id.*   Thus, the Tenth Circuit held that "assuming the legal viability of a backwards looking denial-of-access claim, Plaintiff's case fails under the standards set forth in *Harbury*."   *Id.*

The holdings in *Harbury* and *Jennings* are directly on point and are fatal to Plaintiffs' First and Fourteenth Amendment backward-looking right of access to courts claims.[19]   While

---

[19]   The *Harbury* Court acknowledged that the "basis" of the constitutional right of access to courts is "unsettled," and the Court explained that its decisions have grounded the right of access to courts in the Article IV privileges and immunities clause, the First Amendment petition clause, the Fourteenth Amendment equal protection clause, and the Fifth Amendment and Fourteenth Amendment due process clauses.   *Id.* at 415 & n.12.   The Court nonetheless concluded that "however unsettled the basis of the constitutional right of access to courts," a common element of a backward-looking claim is the identification of a remedy that is not otherwise available in another claim or suit.   *Id.* at 415.   Thus, regardless of whether Plaintiffs assert a First or Fourteenth Amendment court access claim, they must establish that the remedy they seek for their right to access claim is otherwise unavailable in their other claims.

66

Plaintiffs' allegations reference a lost opportunity to pursue an ancillary suit, the complaint does not contain the necessary allegations required under *Harbury*—namely, allegations establishing that the damages Plaintiffs seek pursuant to their right to access claim are different from those available to Plaintiffs in connection with their other claims against Defendants.   Neither Plaintiffs' request for relief, nor any of the substantive allegations in the complaint, distinguishes the relief that Plaintiffs seek on their judicial access claim from the relief they seek on their remaining claims.   Rather, the complaint seeks only actual, compensatory, consequential, and punitive damages against Defendants.   Because Plaintiffs' other claims, most notably their Fourteenth Amendment due process claims, provide Plaintiffs with vehicles to obtain the same remedies they seek in their right to court access claim—*i.e.*, damages—Plaintiffs cannot establish that their right to court access has been frustrated by Defendants' actions.

Plaintiffs' case citations do not persuade the Court otherwise.   As an initial matter, *Harbury* is controlling and cases decided prior to its entry cannot alter its definitive holding. Further, none of Plaintiffs' cases involve backward-looking claims.   *Harbury*, 536 U.S. at 414 n.9 (the Supreme Court has not recognized a backward-looking right to access claim).   Indeed, most of the cases Plaintiffs cite do not even involve the right of court access, and thus are inapposite. *See, e.g.*, *In re Gault*, 387 U.S. 1, 27 (1967) (holding juvenile committed to delinquency school has right to fundamentally fair procedures); *Heryford*, 396 F.2d at 396 (holding individuals committed to a mental health institution have right to fundamentally fair procedures); *Ahern v. Veterans Admin.*, 537 F.2d 1098, 1102 (10th Cir. 1976) (deciding whether plaintiff stated a medical malpractice claim under the Federal Tort Claims Act on the question of informed consent).

Because Plaintiffs' existing claims provide them with the remedy they seek in their right to access claim, Plaintiffs have failed to allege facts that state a constitutional right of access to courts

claim.   For this reason, Plaintiffs have failed to meet their burden under the first prong of the

qualified immunity analysis, and Defendants are entitled to dismissal of Plaintiff's right of access

to court claims.

III.     Motion to Dismiss First Amendment Claim [Doc. 213].

Defendants argue that they are entitled to dismissal of Plaintiffs' First Amendment claim

on the ground of qualified immunity for two reasons:   (1) to the extent Plaintiffs bring a First

Amendment claim premised upon the infringement of their right to intimate association, this right

is not protected by the First Amendment; and (2) to the extent Plaintiffs bring a First Amendment

claim premised upon the infringement of their right to expressive association, Plaintiffs have failed

to allege facts that state a constitutional deprivation.

The right to intimate and family association is not protected by the First Amendment but

rather by the Fourteenth Amendment.   *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 620 (1984)

(holding that the First Amendment protects freedom of expressive association and that the right of

freedom of intimate or family association is a liberty interest); *Griffin v. Strong*, 983 F.2d 1544,

1547 (10th Cir. 1993) (confirming that the right of intimate and familial association "is properly

based on the 'concept of liberty in the Fourteenth Amendment'") (citations omitted).   Thus, to the

extent Plaintiffs allege a First Amendment claim premised upon infringement of intimate

association, Plaintiffs cannot state a constitutional claim, and the Court therefore dismisses the

claim on the ground that Defendants are shielded by the doctrine of qualified immunity.

The First Amendment freedom of expressive association protects association "for the

purpose of engaging in those activities protected by the First Amendment—speech, assembly,

petition for the redress of grievances, and the exercise of religion."   *Jaycees*, 104 S. Ct. at 3249.

"The Constitution guarantees freedom of association of this kind as an indispensable means of

preserving other individual liberties." *Id.*   For, "[a]n individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed."   *Id.* at 3252.

Plaintiffs, however, have not alleged that Defendants' actions of transferring Plaintiffs JL or KC from Los Lunas to Clovis deprived them of their right to associate with others in pursuit of political, social, economic, educational, religious, or cultural ends.   The complaint alleges the deprivation of the right to family association as an end in itself, not as a deprivation of an association for the purpose of pursuing activities protected by the First Amendment.   Thus, Plaintiffs have failed to allege facts that implicate the infringement of their First Amendment right of expressive association.   The Court therefore dismisses Plaintiff's First Amendment claim.

IV.   Motion to Dismiss Fourth Amendment Claim [Doc. 212].

Defendants move for dismissal of Plaintiffs' Fourth Amendment claim on the basis of qualified immunity.   In deciding this motion, the Court must determine whether Defendants' post-discharge conduct of retaining physical custody over Plaintiffs and transporting them (with the exception of RH) across the state constituted an unlawful seizure in contravention of the Fourth Amendment and, if so, whether the law establishing such a violation was clearly established.[20]

---

[20]   Plaintiffs cannot pursue both a Fourth Amendment claim and a Fourteenth Amendment substantive due process claim premised upon the same conduct—*i.e.*, retaining custody of Plaintiffs post-discharge, transporting Plaintiffs across the state, and placing Plaintiffs at ENMRSH or another third-party setting.   *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 388 (1989) (where a plaintiff's rights are protected by a specific provision of the Constitution, such as the Fourth Amendment, then a Fourteenth Amendment claim for substantive due process cannot be brought).

A.      Plaintiffs Have Alleged Facts that State a Violation of their Fourth Amendment
Right to Be Free from Unreasonable Seizure.

As a threshold matter, the Fourth Amendment's protections are not limited to encounters

with law enforcement officials, but rather extend to all persons against all government actors.

The text of the Fourth Amendment itself provides that "the right *of the people* to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated."   U.S. Const. Amend. IV (emphasis added).   In its 1967 decision *Camara v. Municipal*

*Court of the City and County of San Francisco*, the Supreme Court stated that the "basic purpose of

this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and

security of individuals against arbitrary invasions by *government officials*," and that the "Fourth

Amendment thus gives concrete expression to a right *of the people*."   387 U.S. 523, 528 (1967)

(emphasis added) (internal quotation marks and citation omitted).   Admittedly, in dicta, the

Supreme Court has suggested that a primary purpose of the Fourth Amendment was to prohibit

unreasonable intrusions in the course of criminal investigations.   *See Ingraham v. Wright*, 430

U.S. 651, 673 n.42 (1977) (opining in dicta that "the principal concern of [the Fourth]

Amendment's prohibition against unreasonable searches and seizures is with intrusions on privacy

in the course of criminal investigations") (citation omitted); *New Jersey v. T.L.O.*, 469 U.S. 325,

335 (1985) (acknowledging that "[i]t may well be true that the evil toward which the Fourth

Amendment was primarily directed was the resurrection of the pre-Revolutionary practice of using

general warrants or 'writs of assistance' to authorize searches for contraband by officers of the

Crown").   Nonetheless, the Supreme Court confirmed in *T.L.O.* that it "has never limited the

Amendment's prohibition on unreasonable searches and seizures to operations conducted by the

police," that it has "long spoken" of the Fourth Amendment's "strictures as restraints imposed

upon '*governmental* action'" and not simply police action, and that it has entered decisions extending the Fourth Amendment beyond the criminal context. *Id.* at 335. The *T.L.O.* Court reasoned that "[b]ecause the individual's interest in privacy and personal security 'suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards, . . . it would be anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." *Id.* (internal quotation marks and citation omitted). Under this authority, the Court concludes that the Fourth Amendment is applicable to this case, regardless of the fact that Defendants are not law enforcement officers and do not act in furtherance of law enforcement objectives.

The Court thus next must consider whether Plaintiffs have alleged facts that establish they were "seized" when Defendants, after discharging Plaintiffs from state *legal* custody, re-committed Plaintiffs to the *physical* custody of the state, transported them from Los Lunas to Clovis, and placed them in third-party settings, and, if so, whether the seizures were "unreasonable" within the meaning of the Fourth Amendment. A seizure occurs for Fourth Amendment purposes when "government actors have, 'by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen.'" *Graham*, 490 U.S. at 395 n.10 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). Defendants do not appear to dispute whether Plaintiffs submitted to their show of authority and were "seized" within the meaning of the Fourth Amendment. While the complaint's allegations linking Defendants' affirmative conduct to the seizures themselves is sparse, in light of Defendants' failure to contest whether their affirmative conduct resulted in the seizure of Plaintiffs, and the Court's obligation to construe the complaint's

allegations in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs (with the exception of RH) submitted to a show of Defendants' authority.

Simply because Plaintiffs were "seized" within the meaning of the Fourth Amendment, however, does not mean that Defendants violated Plaintiffs' Fourth Amendment rights.   Not all seizures violate the Fourth Amendment.   Rather, the Amendment's prescriptions prohibit only "unreasonable" searches and seizures.   U.S. Const. Amend IV; *see Terry*, 392 U.S. at 9.   Thus, to determine whether a seizure is reasonable, which is the Fourth Amendment's "ultimate standard," *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973), a court must balance the government's interest in conducting the seizure against the individual's interest in being free from arbitrary government interference.   *See T.L.O.*, 469 U.S. at 740.

The Court first weighs Plaintiffs' interest in being free from arbitrary government interference.   Defendants' seizures of Plaintiffs infringed their "inestimable right of personal security." *Terry*, 392 U.S. at 8-9 ("No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.") (internal quotation marks and citation omitted).   On the facts alleged, Defendants failed to provide Plaintiffs with any notice that Defendants had discharged Plaintiffs from the Training School, that Plaintiffs no longer were obligated to remain in state custody, that Plaintiffs were not compelled by court order to accompany Defendants across the state, and that Plaintiffs were not required to acquiesce in the third-party placements chosen by Defendants.   In the absence of this crucial information, Defendants retained custody over Plaintiffs, transported them from Los Lunas to Clovis, and placed them at ENMRSH, or, in the case of GS, at his mother's home.   From Plaintiffs' perspective, they were still involuntarily committed to state custody and were not free to

72

chart for themselves the course of their lives: they were not free to contest being transported

across the state or being placed in a third-party setting of Defendants' choosing.   Thus,

Defendants' seizures eliminated Plaintiffs' freedom not only to possession and control over their

persons but also their choice of where and with whom to live, among other fundamental rights.

Against this most significant of intrusions, the Court must weigh Defendants' interest in

conducting the seizures.   The complaint does not allege facts that establish any motivation or

justification for Defendants' conduct of, after discharging them from the Training School,

retaining physical custody over Plaintiffs, transporting Plaintiffs across the state from Los Lunas

to Clovis, or placing Plaintiffs in a third-party setting.[21]   Thus, on the facts alleged, construed in

the light most favorable to Plaintiffs, the Court concludes that Defendants had no justification,

valid or otherwise, for seizing Plaintiffs.   The lack of justification, on the facts alleged, is fatal.

The obvious result of balancing Plaintiffs' weighty interests against Defendants' absent interests is

that Defendants' seizures of Plaintiffs were unreasonable and violated the Fourth Amendment.[22]

---

[21]   While the complaint alleges that Defendants discharged Plaintiffs from the Training School to eliminate the dangers associated with the lack of oversight in the aftercare program, the complaint is silent on the question of Defendants' justification for retaining custody and control over Plaintiffs post-discharge.

[22]   Although the Court holds that Defendants' post-discharge conduct violated the Fourth Amendment, the Court does not hold that Defendants' pre-discharge conduct (*i.e.*, aftercare placements) violated Plaintiffs' Fourth Amendment rights.   Defendants had legal custody of Plaintiffs at the time of their aftercare placements and therefore Defendants' seizures of Plaintiffs and transfers of Plaintiffs to aftercare settings were not unreasonable within the meaning of the Fourth Amendment.   *See Hunt v. Green*, 376 F. Supp. 2d 1043, 1056 (D.N.M. 2005).   Although courts have held that involuntarily committed persons have a Fourth Amendment right to be free from unlawful searches, *see Beaulieu v. Ludeman*, 690 F.3d 1017, 1028 (8th Cir. 2012), and the Tenth Circuit has held that prisoners have a Fourth Amendment right to be free from unlawful searches, *see Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995), no court has held that either civilly-committed individuals or prisoners have a right to be free from unlawful seizures.

B.       Plaintiffs' Fourth Amendment Rights were Clearly Established.

The parties hotly contest the answer to the question in dispute:  Whether, under law clearly established at the time of JL's, EH's, and KH's, March 23, 1979, post-discharge transfers, DA's January 17, 1976, post-discharge transfer, and GS's October 22, 1980, post-discharge transfer, administrators of a mental health facility were required to comply with the strictures of the Fourth Amendment when they engaged in conduct unrelated to law enforcement.   As set forth above, as of the time of the challenged conduct, Supreme Court authority made clear that the Fourth Amendment protects the rights of *all people*, not just those accused of a crime, against conduct of *all government actors*, not just law enforcement officers, even if the conduct is not for enforcement of criminal law.   *See supra* § IV.A.   Although general statements of law are not typically sufficient to provide notice, the Supreme Court has confirmed they are "not inherently incapable of giving fair and clear warning."   *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).   Rather, "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."   *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007).   Given the egregiousness of the conduct at issue, *i.e.*, a significant intrusion justified by no state interest at all, the Court holds that the Fourth Amendment case law, although general, is sufficiently clear to provide notice to a reasonable official in Defendants' position that the seizures violated Plaintiffs' rights.   Specifically, any reasonable official in Defendants' position would have known that to seize a person without any justification (valid or invalid), and transport that person across the state, constitutes arbitrary government action that violates the Fourth Amendment's prohibition on unreasonable seizures.

In addition to these broader propositions of law, in cases decided in 1967 and 1978, the Supreme Court specifically applied the Fourth Amendment's protections to persons not suspected

74

of criminal activity and its prohibitions to government actors other than law enforcement.   First, in *Camara v. Municipal Court of the City and County of San Francisco*, the Court held that the Fourth Amendment's protections applied to a private property owner suspected of no crime, and that it proscribed the conduct of an inspector conducting a civil inspection of private premises. 387 U.S. at 530.   In so holding, the Court explicitly rejected the notion that the Fourth Amendment protects only those who are suspected of a crime or only to searches that are for evidence of a crime.   *Id.*

In reaching its decision, the Court overruled its prior decision in *Frank v. State of Maryland*, 359 U.S. 360 (1959), which had upheld by a five-to-four vote a state court conviction of a homeowner who had refused to permit a municipal health inspector to enter and inspect his premises, without a search warrant, for the purpose of abating a public nuisance.   *Camara*, 387 U.S. at 525, 529.   *Frank*, which the *Camara* Court overruled, rested upon the faulty premises that "municipal fire, health, and housing inspection programs touch at the most upon the periphery of the important interests safeguarded by the Fourteenth Amendment's protections against official intrusion," and that because the inspector does not seek to search for evidence of criminal action to secure protection, historic interests of "self-protection" jointly protected by the Fourth and Fifth Amendments are not involved.    *Frank*, 359 U.S. at 367; *accord Camara*, 387 U.S. at 530.

In *Camara*, the Fourth Amendment question came before the Court on appeal by the lessee-appellant of the ground floor of an apartment building for a writ prohibiting his prosecution in California municipal court on the criminal charge of violating the city housing code by refusing to permit a warrantless inspection of his premises.   *See id.* at 525.   The appellant contended that the city ordinance authorizing warrantless entry of a building was contrary to the Fourth Amendment.   *Id.* at 527.   The California district court of appeals, relying upon *Frank*, held that

75

the ordinance "does not violate Fourth Amendment rights because it 'is part of a regulatory scheme which is essentially civil rather than criminal in nature.'"   *Id.* at 527-28 (quoting district court opinion).   Upon the California Supreme Court denial of a petition for rehearing, the Supreme Court noted probable jurisdiction and concluded that *Frank*, to the extent that it sanctioned warrantless searches, must be overruled.   *Id.* at 525, 528.

In so holding, the Supreme Court reasoned that the "basic purpose of [the Fourth] Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of *individuals* against arbitrary invasions by government *officials*."   *Id.* at 528 (emphasis added).   While the Court agreed with *Frank* that "a routine inspection of the physical condition of private property is a less hostile intrusion than the typical policeman's search for the fruits and instrumentalities of crime," it could not agree "that the Fourth Amendment interests at stake in these inspection cases are merely 'peripheral.'"   *Id.* at 530.   The *Camara* Court stated that "[i]t is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior."   *Id.* at 530. Rather, the Court explained, "even the most law-abiding citizen has a very tangible interest in limiting the circumstances under which the sanctity of his home may be broken by official authority, for the possibility of criminal entry under the guise of official sanction is a serious threat to personal and family security."   *Id.* at 530-31.

Defendants contend that *Camara* is distinguishable because, although the search at issue in that case was civil, the occupant of the building was prosecuted criminally.   While *Camara* acknowledged that administrative inspections enforced by criminal processes implicate "self-protection" interests, this recognition was not the basis of the Court's reasoning.   Rather, the Court acknowledged this proposition only after rejecting *Frank*'s conclusion that administrative

searches do not impinge Fourth Amendment interests, and in the context of noting that "*[a]nd even*

accepting *Frank's* rather remarkable premise, inspections of the kind we are here considering do in

fact jeopardize 'self-protection' interests of the property owner."   *Id.* at 531.

The facts of *Camara* are sufficiently analogous to those at issue in the instant case to have

placed Defendants on notice that their conduct was proscribed by the Fourth Amendment.

Admittedly, *Camara* is distinguishable because the government action undertaken therein was for

a purpose—*i.e.*, the inspector was conducting a search pursuant to a municipal ordinance

providing for periodic inspections of buildings, while here, there was no basis for Defendants'

conduct.   This distinction, however, only provides further support for this Court's conclusion that

Plaintiffs herein were entitled to protection under the Fourth Amendment, as the deprivation of

Plaintiffs' rights was rendered all the more unreasonable by the lack of any justification for

Defendants' conduct.

The Supreme Court's May 31, 1978, decision in *Michigan v. Tyler*, 436 U.S. 499 (1978),

published almost ten months before JL's, EH's, and KC's March 23, 1979, seizures and almost

two and one-half years before GS's seizure, similarly would have placed a reasonable official in

Defendants' position on notice that the Fourth Amendment extends beyond the context of criminal

law enforcement.   In *Tyler*, the Court explicitly stated that "[t]he decisions of this Court firmly

establish that the Fourth Amendment extends beyond the paradigmatic entry into a private

dwelling by a law enforcement officer in search of the fruits or instrumentalities of a crime."   *Id.*

at 504.   The Court then cited its decision in *Camara*, noting its statement that "'the basic purpose

of [the Fourth] Amendment . . . is to safeguard the privacy and security of individuals against

arbitrary invasions by governmental officials.'"   *Id.* (quoting *Camara*, 387 U.S. at 528).

Importantly, the Court then confirmed that "[t]he officials may be health, fire, or building

77

inspectors.   Their purpose may be to locate and abate a suspected public nuisance, or simply to perform a routine periodic inspection."   *Id.* at 504-05 (internal quotation marks and citations omitted).   The *Tyler* Court held that "[t]hese deviations from the typical police search are thus clearly within the protection of the Fourth Amendment."   *Id.* at 505.   The Court further stated, "there is no diminution in a person's reasonable expectation of privacy nor in the protection of the Fourth Amendment simply because the official conducting the search wears the uniform of a firefighter rather than a policeman, or because his purpose is to ascertain the cause of a fire rather than to look for evidence of a crime."   *Id.* at 506.   Because the fire officials did not have a warrant to search or consent to enter, the Court held that the searches were illegal unless otherwise excepted from the warrant requirement.   *Id.* at 508-09.   The facts of *Tyler*, like those *Camara*, were sufficiently analogous to the facts of the instant case to have placed Defendants on notice that their conduct violated Plaintiffs' rights.

Defendants contend that in the late 1970s, "the Fourth Amendment's protections arose primarily in the criminal context."   [Doc. 270 at 2].   While this contention may be true, it fails to negate the fact that multiple Supreme Court cases specifically held that the Fourth Amendment applies in other non-criminal contexts.

Defendants further assert that it was not until later in 1996 and 1999 that the Tenth Circuit held that seizures for the purposes of conducting mental health evaluations and detoxification implicate the Fourth Amendment.   *See Pino v. E.P. Higgs*, 75 F.3d 1461, 1468 (10th Cir. 1996) (mental health); *Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584, 590 (10th Cir. 1999) (detoxification).   Defendants, however, mischaracterize the significance of these cases, which decided the wholly separate issue of whether certain categories of conduct—*i.e.*, mental health evaluations and detentions for detoxification—were reasonable and therefore excluded from the

Fourth Amendment's prohibition on "unreasonable" seizures and searches.   There is nothing in those cases to suggest that, prior to their publication, the Fourth Amendment's proscriptions did not apply at all in the non-criminal contexts in which those cases were decided.

For the foregoing reasons, the Court holds that there was Supreme Court precedent sufficiently analogous to the facts here to provide Defendants with notice that seizing Plaintiffs, transporting them across the state, and placing them in a third-party setting, without consent or justification, would be unreasonable and would violate Plaintiffs' Fourth Amendment rights. Because Plaintiffs thus have satisfied both prongs of their qualified immunity burden, the Court denies Defendants' Motion to Dismiss Fourth Amendment Claim.

## <u>CONCLUSION</u>

**IT THEREFORE IS ORDERED** that the Individual DOH Defendants' Motion and Memorandum in Support to Dismiss Plaintiffs' Procedural Due Process Claims on the Basis of Qualified Immunity, [Doc. 267], is **GRANTED IN PART** and **DENIED IN PART** as follows:

(1)     The Court grants dismissal of Plaintiffs' claims to the extent the claims are premised upon the following:

(a)     *Discharges* from the Training School depriving Plaintiffs of a protected liberty interest;

(b)     *Aftercare transfers* to third-party settings depriving Plaintiffs of a liberty interest in freedom from undue restraint;

(c)     *Post-discharge transfers* to third-party settings depriving Plaintiffs of liberty interests in personal security and safe conditions of confinement and in minimally adequate food, shelter, and medical care;

(d)     *Aftercare transfers* of Plaintiffs to third-party settings depriving Plaintiffs of a protected property interest in SSI benefits and Medicaid payments; and

(e)     *Aftercare and post-discharge transfers* to third-party settings depriving Plaintiffs of protected liberty interests in receipt of habilitation services, placement in the least restrictive setting, and the opportunity to associate

with family and peers.

(2)    The Court denies dismissal of Plaintiffs' claims to the extent the claims are premised upon the following:

    (a)    *Post-discharge transfers* to third-party settings depriving Plaintiffs of a property interest in benefits under the 1953 Developmental Disabilities Code;

    (b)    *Post-discharge transfers* to third-party settings depriving Plaintiffs of a liberty interest in freedom from undue restraint;

    (c)    *Aftercare transfers* to third-party setting depriving Plaintiffs of liberty interests in personal security and safe conditions of confinement and in minimally adequate food, shelter, and medical care; and

    (d)    *Post-discharge transfers* to third-party settings depriving Plaintiffs of a protected property interest in SSI benefits and Medicaid payments.

**IT FURTHER IS ORDERED** that the Individual DOH Defendants' Motion to Dismiss Plaintiffs' First Amendment Claim on the Basis of Qualified Immunity and Supporting Memorandum, [Doc. 213], is **GRANTED**, that the Individual DOH Defendants' Motion and Memorandum to Dismiss Plaintiffs' Court Access Claims Under the First and Fourteenth Amendments on the Basis of Qualified Immunity, [Doc. 275], is **GRANTED**, and that the Individual DOH Defendants' Motion to Dismiss Plaintiffs' Fourth Amendment Claim on the Basis of Qualified Immunity and Supporting Memorandum, [Doc. 212], is **DENIED**.

Dated this 29th day of September, 2015.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE