## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

JL, through her next friend, Bruce Thompson,
Esq., et al.

        Plaintiffs,

v.                                    No. 12-CV-1145 MV/LAM

NEW MEXICO DEPARTMENT OF HEALTH,
et al.,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Individual DOH Defendants'[1] Motion to Dismiss Plaintiffs' Substantive Due Process Claim on the Basis of Qualified Immunity and Supporting Memorandum ("Motion to Dismiss Substantive Due Process Claim").   [Doc. 214]. The Court, having considered the motion, briefs, and relevant law, and being otherwise fully informed, finds that the Motion to Dismiss Plaintiffs' Substantive Due Process Claim is well-taken and will be granted.

## BACKGROUND

Plaintiffs' 42 U.S.C. Section 1983 claims for violation of Plaintiffs' Fourteenth Amendment rights to substantive due process [Doc. 102 at 372–87] arise out of Defendants' alleged unilateral decisions (1) temporarily to transfer Plaintiffs from the Los Lunas Hospital and Training School and the Fort Stanton Hospital and Training School (collectively, the "Training

---

[1]   The "Individual DOH Defendants" refers to Defendants Beth Schaefer, Dan Sandoval, Roger Adams, and Joseph Mateju (referred to herein as "Defendants").

School")—which at the time of the events giving rise to Plaintiffs' claims were State of New Mexico institutions operated by the New Mexico Department of Health ("DOH") that housed people with developmental disabilities—to the privately-run, third-party setting Eastern New Mexico Mental Retardation Services ("ENMRSH") and/or another third-party setting, and (2) permanently to discharge Plaintiffs from the Training School and transfer Plaintiffs to ENMRSH and/or another third-party setting.   Plaintiffs allege that Defendants effectuated the discharges, transfers, and placements without notice to Plaintiffs, without obtaining informed consent, and either without judicial process or without notice and an opportunity to be heard in judicial process.   Plaintiffs further allege that Defendants discharged Plaintiffs from the Training School without informing them of their discharges or of Defendants purported severance of the State's custodial relationship with Plaintiffs.

The allegations in the First Amended Complaint supporting Plaintiffs' claims are fully set forth in the Court's Memorandum Opinion and Order dated September 30, 2015.   [Doc. 375]. The Court incorporates those facts by reference herein.

## STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."   Fed. R. Civ. P. 12(b)(6).   "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick,* 40 F.3d 337, 340 (10th Cir. 1994).   The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

2

322 (2007); *Smith v. U.S.*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citation omitted), *cert. denied*, 558 U.S. 1148 (2010).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff's complaint must contain sufficient facts which, if assumed to be true, state a claim to relief that is plausible on its face. *See Twombly*, 550 U.S. at 570; *Mink v. Knox*, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis omitted). The Tenth Circuit has explained,

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

*Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570) (internal citations omitted).

Although qualified immunity is most often raised at the summary judgment stage, the Tenth Circuit has recognized the propriety of raising a qualified immunity defense in a motion to dismiss.  *See Pueblo Neighborhood Health Ctr., Inc. v. Losavio*, 847 F.2d 642, 645–46 (10th Cir. 1988); *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004).

## DISCUSSION

Plaintiffs assert claims against Defendants pursuant to 42 U.S.C. Section 1983 for violation of Plaintiffs' Fourteenth Amendment right to substantive due process.  Specifically, Plaintiffs allege that Defendants' actions of temporarily placing Plaintiffs on aftercare in third-party settings, permanently discharging Plaintiffs from the Training School, and transferring Plaintiffs post-discharge to ENMRSH deprived Plaintiffs of their liberty interests in (1) freedom from undue restraint; (2) personal security and safe conditions of confinement; (3) minimally adequate food, clothing, shelter, and medical care; (4) placement in the least restrictive setting; and (5) the opportunity to associate with family and peers.  [Doc. 102 at 376].  Plaintiffs also allege that Defendants' actions deprived Plaintiffs of their property interests in government-funded treatment and services, including habilitation services.  *Id.*

Defendants argue that they are shielded by qualified immunity from Plaintiffs' substantive due process claims because the rights that Plaintiffs assert were not clearly established at the time of the challenged conduct that gave rise to Plaintiffs' claims.  [Doc. 214 at 5].  In particular, Defendants note that Plaintiffs' claims arise from Defendants' alleged transfers of Plaintiffs, [Doc. 214 at 2, 4–5], all of which occurred between 1976 and 1980.  [Doc. 102 at 135, 192, 203, 271, 299, 331].  According to Defendants, because substantive due process rights were not clearly established for the developmentally disabled in involuntarily commitment at the time of the challenged transfers, Defendants are entitled to dismissal of Plaintiffs' substantive due

4

process claims on the basis of qualified immunity.   As set forth herein, the Court agrees that Defendants are entitled to qualified immunity on Plaintiff's substantive due process claims to the extent that those claims arise from conduct that occurred prior to the Supreme Court's decision in *Youngberg v. Romeo*, 457 U.S. 307 (1982).

I.   **Qualified Immunity Legal Standard**

Once a defendant raises the defense of qualified immunity in a Rule 12(b)(6) motion, the burden shifts to the plaintiff to (1) come forward with allegations sufficient to show that the defendant's alleged actions violated a federal constitutional or statutory right and (2) show that the federal right was clearly established at the time of the challenged conduct.   *See Pueblo*, 847 F.2d at 646; *P.J. ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1196 (10th Cir. 2010).   A district court has "the freedom to decide 'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'"   *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).   Because Defendants argue that the alleged transfers giving rise to Plaintiffs' substantive due process claims occurred before these rights were clearly established, the Court begins its analysis with the second prong.

In determining whether the right at issue has been clearly established, the Tenth Circuit has held that ordinarily "there must be a Supreme Court or Tenth Circuit opinion on point," *Garramone v. Romo*, 94 F.3d 1446, 1451 (10th Cir. 1996), or "the weight of authority from other courts [must] show[] that the right must be as plaintiff maintains," *Roska v. Peterson*, 328 F.3d 1230, 1248 (10th Cir. 2003).   In particular, the Supreme Court has held that "'the contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right.'"   *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Anderson*

5

*v. Creighton*, 483 U.S. 635, 640 (1987)).   A district court must conclude that the right was clearly established "in light of the specific context of the case, not as a broad general proposition." *Id*. at 201.   *See also Brosseau v. Haugen*, 543 U.S. 194, 198–99 (2004) (explaining that it is inappropriate for a court to define clearly established law at a high level of generality).   In sum, "[T]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."   *Saucier*, 533 U.S. at 202.

II.  **"Clearly Established" Analysis**

Plaintiffs claim that when Defendants transferred them to privately-run third-party facilities, first through the aftercare program and eventually as post-discharge placements, they had substantive due process rights to (1) freedom from undue restraint; (2) personal security and safe conditions of confinement; (3) minimally adequate food, clothing, shelter, and medical care; (4) placement in the least restrictive setting; (5) the opportunity to associate with family and peers; and (5) government-funded treatment and services, including habilitation services.   [Doc. 102 at 376].   Defendants argue that no such rights were clearly established at the time of these transfers.   [Doc. 214 at 5; Doc. 268 at 9].   Defendants further argue that because Plaintiffs were all eventually permanently discharged into the care of ENMRSH and no longer in the State's physical custody, there are no substantive due process rights clearly established at present for individuals who were not in state custody at the time of the alleged violations.   [Doc. 214 at 8; Doc. 268 at 5].

As a preliminary matter, this Court has already rejected Defendants' argument that Plaintiffs' post-discharge placements at ENMRSH necessarily terminated the State's custodial responsibilities over Plaintiffs.   As this Court held in its Memorandum and Opinion on Defendants' Motion to Dismiss Plaintiffs' Procedural Due Process Claims on the Basis of

6

Qualified Immunity, "Because Defendants failed to inform Plaintiffs that they were free from involuntary commitment, on the facts alleged, it is as if Defendants effectuated a *de facto* re-commitment of Plaintiffs to state custody. . . . on the facts alleged Plaintiffs had no way of discerning that Defendants' post-discharge placements of Plaintiffs at ENMRSH were any different from their pre-discharge placements at ENMRSH on aftercare."   [Doc. 375 at 32–33, n.10].   Accordingly, the question before the Court is whether substantive due process rights were clearly established for the developmentally disabled in involuntary commitment at the time that Defendants transferred Plaintiffs to ENMRSH, namely the period from 1976 through 1980.

The Due Process Clause of the Fourteenth Amendment provides that "no state shall… deprive any person of life, liberty, or property, without due process of law."   The distinction between procedural and substantive due process was not clearly recognized until the early twentieth century.   See, *e.g.*, Ryan C. Williams, *The One and Only Substantive Due Process Clause*, 120 YALE L.J. 408, 417 (2010).   Today, substantive due process rights may be understood as limitations against state deprivation of life, liberty, or property "even if those individuals receive an adjudication in which 'even the fairest possible procedures[s]' are observed."   *Id.* at 419 (citing *Poe v. Ullman*, 367 U.S. 497, 541 (1961) (Harlan, J., dissenting) ("Were due process merely a procedural safeguard it would fail to reach those situations where the deprivation of life, liberty or property was accomplished by legislation which by operating in the future could, given even the fairest possible procedure in application to individuals, nevertheless destroy the enjoyment of all three.").   In this way, substantive due process rights are exceptional limitations on state action.   In particular, the Due Process Clause is phrased as a limitation over the State's power to act, not as a state obligation to protect life, liberty, and property against invasion by private actors:   "Its purpose was to protect the people from the

7

State, not to ensure that the State protected them from each other." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–96 (1989). However, "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198. Over time, the Supreme Court has identified groups of individuals who, because of state intrusion on their liberties, have substantive due process rights to adequate protection.

In *Estelle v. Gamble*, the Supreme Court recognized that the Eighth Amendment's prohibition against cruel and unusual punishment, applicable to the States through the Fourteenth Amendment's Due Process Clause, requires the State to provide adequate medical care to prisoners. 429 U.S. 97, 103 (1976). The Court reasoned that because "an inmate must rely on prison authorities to treat his medical needs [and] if the authorities fail to do so, those needs will not be met," the State should be required to provide adequate care in meeting these needs. *Id.* Subsequent cases have refined the contours of substantive due process rights for prisoners. *See, e.g.*, *Ramos v. Lamm*, 639 F.2d 559 (10th Cir. 1980) (finding conditions concerning shelter, sanitation, food, personal safety, health care, restrictions on visitation rights, and mail restrictions violated prisoner's substantive due process rights); *Rhodes v. Chapman*, 452 U.S. 337 (1981) (finding that "double celling" conditions of housing two prisoners in one cell were insufficient to support a conclusion of cruel and unusual punishment); *Davidson v. Cannon*, 474 U.S. 344, 347–48 (1986) (finding that negligence on the part of prison officials does not rise to the level of a substantive due process violation); *Helling v. McKinney*, 509 U.S. 25 (1993) (finding valid substantive due process claim for prisoner seeking to prevent harm from exposure to tobacco smoke).

Thereafter, in *Youngberg v. Romeo*, the Supreme Court considered "*for the first time* the

substantive rights of involuntarily committed [developmentally disabled] persons under the Fourteenth Amendment to the Constitution."   457 U.S. at 314 (emphasis added).   The plaintiff in *Youngberg* was severely developmentally disabled, lacking in basic self-care abilities, and suffered several injuries while in involuntary commitment, including injuries caused by other residents, by his own actions, and by restraints the institution applied in an effort to keep the plaintiff and others safe.   *Id*. at 309–10.   The plaintiff argued that the State was obligated to institute appropriate preventive measures in order to preserve his substantive due process rights to safe conditions of confinement, freedom from bodily restraint, and training or "habilitation." *Id*. at 310–11.   The Court agreed, and specifically extended the substantive due process rights under the Eighth Amendment to the involuntary commitment context, reasoning that "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions."   *Id*. at 315–16.   Accordingly, the Court in *Youngberg* found a new exception to the general rule that the Due Process Clause does not obligate States to protect private citizens from each other.   The Court reasoned that because individuals in involuntary commitment become dependent on the State for basic needs, they have substantive due process rights to adequate safety and care.   *Id*.

In *DeShaney*, the Supreme Court reaffirmed that, through its decision in *Youngberg,* it had extended the substantive due process rights announced in *Estelle* to the context of the developmentally disabled in involuntary commitment.   Specifically, the Court noted that in *Estelle*, it had "recognized that the Eighth Amendment's prohibition against cruel and unusual punishment, made applicable to the States through the Fourteenth Amendment's Due Process Clause, requires the State to provide adequate medical care to incarcerated prisoners," based on

the reasoning that "because the prisoner is unable by reason of the deprivation of his liberty to care for himself, it is only just that the State be required to care for him."   *DeShaney*, 489 U.S. at 198–99 (citations omitted).   The Court next noted that in *Youngberg*, it had "extended this analysis beyond the Eighth Amendment setting, holding that the substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others."   *Id*. at 199 (citations omitted).   The Court declined to extend substantive due process rights to the case before it where a child was harmed not while in the State's custody but rather in the custody of his father, explaining that, taken together, *Estelle* and *Youngberg* "stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."   *Id*. at 199–200.   Thus, the Court explained, after *Youngberg*, "[i]n the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause."   *Id*. at 200.

The Supreme Court's own analysis in *DeShaney* persuades this Court that the substantive due process rights of developmentally disabled individuals in involuntary commitment were not clearly established until its decision in *Youngberg*.   Before it decided *Youngberg*, the Supreme Court had not considered, much less established, substantive due process rights in the specific context of involuntarily committed developmentally disabled persons.   Similarly, Plaintiffs have not pointed to, and this Court has not found, any Tenth Circuit cases predating *Youngberg* that established substantive due process rights in this context.   As noted above, a right must be clearly

established not as a broad general proposition, but rather in light of the specific context of the case. *See Saucier*, 533 U.S. at 201.   While cases such as *Estelle* introduced the "broad proposition" of due process rights for those held in state custody, it was not until *Youngberg* that the right to state protections for those institutionalized by the State was clearly established.   Accordingly, the very rights Plaintiffs allege were violated here—those of involuntarily committed developmentally disabled individuals—were not clearly established during the relevant time period, namely when Defendants permanently transferred Plaintiffs to ENMRSH from 1976 through 1980.   Because it would not have been "clear to a reasonable officer" at the New Mexico Department of Health "that his conduct was unlawful in the situation he confronted," *Saucier*, 533 U.S. at 202, Plaintiffs are unable to overcome the defense of qualified immunity.

This Court's conclusion is consistent with the decision reached by a fellow judge in another case filed in this District on behalf of other plaintiffs who were transferred from the Training School to privately-funded third-party settings, just as Plaintiffs were here.   *See A.M. v. New Mexico Dep't of Health*, 65 F. Supp. 3d 1206 (D.N.M. 2014).   In *A.M.*, Defendants filed a motion to dismiss the plaintiff's substantive due process claims; that motion is identical to their instant motion in this case.   Judge Browning granted the motion, holding that Defendants were entitled to qualified immunity for claims arising before the Supreme Court's decision in *Youngberg*.   Discussing *DeShaney*, the Court held that state officials were not on notice of the substantive due process rights of involuntarily committed developmentally disabled persons until the Court articulated such rights in *Youngberg*.   Ultimately, the Court held:

> "In the Court's view, *Youngberg v. Romeo* clearly established that, when the state involuntarily commits a developmentally disabled individual to state custody, it makes a promise to that individual's family and friends that it will stand in their stead, and take responsibility for his or her health and safety.   Indeed, the promise of these protections is the primary justification for the significant

11

> infringement of fundamental liberty interests that the involuntary commitment of developmentally disabled individuals entails.   Accordingly, on June 18, 1982, *Youngberg v. Romeo* put the state and its agents on notice that they had to provide substantive due-process protections to all developmentally disabled individuals involuntarily committed to state custody—regardless of their physical location. Defendants could not neglect these responsibilities by leaving a developmentally disabled individual with an unlicensed private third party."

65 F. Supp. 3d at 1267–69.   This Court agrees with Judge Browning's reasoning and sees no basis to reach a conclusion different from that reached in *A.M.*

Plaintiffs' arguments do not convince the Court otherwise.   Plaintiffs argue that during the 1970s there was a clearly established broader substantive due process right, held by all persons, to be free from state subjection to deprivation of rights at the hands of third-parties.   In support of that argument, Plaintiffs first cite the very text of Section 1983 itself.   [Doc. 246 at 28–30].   The Court rejects this argument for three reasons.   First, as a general rule, the Due Process Clause does not obligate States to protect individuals from harm by other private parties.   *DeShaney*, 489 U.S. at 195–96.   As explained above, the Supreme Court has made only limited exceptions to this general rule, obligating the State to protect specific groups from harm by third parties in light of the restraints that the State has imposed on the liberties of those individuals.   *Id*. at 200.   Because developmentally disabled individuals in involuntary commitment were not specifically identified as a group entitled to state protection from harm by third parties at the time of the conduct at issue in this case, Plaintiffs' substantive due process rights were not clearly established at that time.

Second, Section 1983 does not itself establish substantive due process rights.   Rather, the statute provides a vehicle for bringing a claim to redress a violation of a federal right that has been established elsewhere.   As Plaintiffs recognize, Section 1983 imposes liability on "every person who, under color of [state law] . . . subjects or causes to be subjected any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . ."   The statute

thus creates a cause of action where state officials cause a citizen to be subject to a deprivation of substantive due process rights.   It does not, however define, articulate or otherwise establish any substantive due process rights.   *See, e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) (quoting *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 617 (1979)) ("[Section] 1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere, *i.e.,* rights independently 'secured by the Constitution and laws' of the United States. '[O]ne cannot go into court and claim a 'violation of [Section] 1983'—for [Section] 1983 by itself does not protect anyone against anything.'").

Third, even if, as Plaintiffs argue, Section 1983 somehow established that "a state actor may not use the authority of the state to 'give' one citizen to another," [Doc. 246 at 29], such a broad proposition would not be sufficiently clear for a reasonable official in Defendants' position to understand that transferring Plaintiffs, as they did, would violate that right.   Indeed, not only does the broad principle that Plaintiffs urge the Court to adopt fail to give clear direction to state officials who hold developmentally disabled persons in involuntary commitment, but also it would be nonsensical and unworkable.   In effect, Plaintiffs' broad principle would prevent the State from ever terminating involuntary commitment, as such termination would necessarily entail transferring the individual, who remains to some degree unable to care for himself or herself, into the care of someone else.

In further support of their argument that their substantive due process rights were clearly established, Plaintiffs cite a Seventh Circuit case decided in 1974, before their transfers.   [Doc. 246 at 31, citing *Spence v. Staras*, 507 F.2d 554 (7th Cir. 1974)].   In *Spence*, the plaintiff was a patient in a mental hospital who died due to injuries caused by fellow patients.   The court held that state officers were liable for failing to provide the plaintiff with safe confinement conditions.

*Spence*, 507 F.2d at 557.   As explained above, in order for substantive due process rights to be clearly established, Supreme Court or Tenth Circuit precedent or "the weight of authority from other courts [must] show[] that the right must be as plaintiff maintains." *Roska*, 328 F.3d at 1248; *Garramone*, 94 F.3d at 1451.   *Spence*—a single case from a circuit other than the Tenth Circuit—falls shy of meeting the "weight of authority" requirement such that Defendants would have been on notice of Plaintiffs' substantive due process rights.

Finally, Plaintiffs support their argument by citing to yet a third case filed in this District involving the same Defendants and similar allegations.   [Doc. 246 at 10–12 (citing *J.M. v. New Mexico Dep't of Health*, No. CIV 07-0604 RB/ACT)].   Contrary to Judge Browning's holding in *A.M.*, Judge Brack in *J.M.* denied Defendants' motion to dismiss the plaintiff's substantive due process claims, finding that "the legal contours of the doctrine of substantive due process were sufficiently clear in the 1970s to give state officials fair warning that it violated federal law to recklessly endanger developmentally disabled individuals by committing them to the custody of unlicensed third party businesses, where they would be economically exploited and deprived of essential medical care."   *J.M.*, No. CIV 07-0604 RB/ACT, Doc. 198 at 8.   Judge Brack reasoned that the Eighth Amendment protections under *Estelle* were sufficient to put state officials on notice that they were constitutionally required to provide to involuntarily committed, developmentally disabled individuals the same protections as they were required to provide to incarcerated prisoners.   *Id*.

With all due respect to Judge Brack's thoughtful opinion, this Court must disagree.   As explained above, this Court is not persuaded that substantive due process cases under the Eighth Amendment, such as *Estelle*, clearly established corresponding rights for individuals institutionalized, rather than incarcerated, by the State.   Before *Youngberg*, reasonable state

14

officers could differ in analyzing whether the Eighth Amendment cases conferred the same rights on involuntarily committed developmentally disabled individuals as they did on incarcerated prisoners.   This Court thus reaches a conclusion different from that reached by its colleague in *J.M.*

For all of these reasons, the Court concludes that Plaintiffs' substantive due process rights were not clearly established until the Supreme Court addressed them directly in *Youngberg* in 1982.   It follows that Defendants are entitled to dismissal, on the basis of qualified immunity, of Plaintiffs' substantive due process claims arising from Defendants' transfers of Plaintiffs between 1976 and 1980.

III. **Special Relationship and Danger Creation Doctrines**

Because Plaintiffs' substantive due process rights were not clearly established until 1982, after the alleged transfers of Plaintiffs to third-party institutions, the Court does not reach Plaintiffs' arguments regarding Defendants' duties to Plaintiffs under the special relationship or danger creation theories.   To the extent that Plaintiffs' First Amended Complaint states substantive due process claims arising after *Youngberg*, the Court does not reach a decision on how these theories may apply to those claims.

<u>**CONCLUSION**</u>

IT THEREFORE IS ORDERED that the Individual DOH Defendants' Motion to Dismiss Plaintiffs' Substantive Due Process Claim on the Basis of Qualified Immunity and Supporting Memorandum, [Doc. 214], is **GRANTED**, as follows:   Plaintiffs' substantive due process claims, to the extent that those claims arise out of conduct that occurred prior to the Supreme Court's decision in *Youngberg v. Romero*, 457 U.S. 307 (1982), are dismissed.   To the extent that Plaintiffs allege substantive due process claims arising out of conduct that occurred after

15

*Youngberg*, those claims remain viable.


Dated this 4th day of March, 2016.

_____

MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE